In The

# United States Court of Appeals
### For The Fifth Circuit

**ERMA WILSON,**

*Plaintiff-Appellant,*

*v.*

**MIDLAND COUNTY, TEXAS;
WELDON (RALPH) PETTY, JR., sued in his individual capacity;
ALBERT SCHORRE, JR., sued in his individual capacity,**

*Defendants-Appellees.*

On appeal from the United States District Court
for the Western District of Texas,
7:22-cv-85, Hon. David Counts, District Judge, presiding.

---

## PLAINTIFF-APPELLANT'S OPENING BRIEF

---

Jaba Tsitsuashvili
  *Lead counsel*
Robert J. McNamara
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
(703) 682-9320
jtsitsuashvili@ij.org

*Counsel for Plaintiff-Appellant*

# Certificate of Interested Persons

(1)     Case no. 22-50998, *Wilson v. Midland County, Texas et al.*

(2)     The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

| **Appellant** | **Counsel for Appellant** |
|---|---|
| Erma Wilson | INSTITUTE FOR JUSTICE<br>Jaba Tsitsuashvili<br>Robert J. McNamara |

| **Appellees** | **Counsel for Appellees** |
|---|---|
| Midland County, Texas<br>Weldon (Ralph) Petty, Jr. | SHAFER, DAVIS, O'LEARY & STOKER<br>Layne Rouse<br>Miles Nelson |
| Albert Schorre, Jr. | LYNCH, CHAPPELL & ALSUP<br>Randall L. Rouse<br>Steven Kiser<br>Lisa K. Hooper |

s/ Jaba Tsitsuashvili
*Lead Counsel for Plaintiff-Appellant*

**Statement Regarding Oral Argument**

Plaintiff-Appellant Erma Wilson respectfully submits that oral argument will aid the Court's disposition of this case, which presents important issues regarding civil rights litigation and rules of precedent.

Substantively, this case presents a recurring question with an entrenched circuit split—specifically, the viability of certain federal constitutional claims under the federal civil rights statute, 42 U.S.C. § 1983. Procedurally, this case presents important questions regarding this Court's rules of precedent and orderliness.

Oral argument will aid this Court's consideration of these issues. The Court may have questions about Appellant's argument that no statute or precedent forecloses her due process claims (arising from prosecution and adjudication tainted by documented conflicts of interest). The Court may also have questions about the effects of this Court's and the Supreme Court's precedents on that argument.

# Table of Contents

**Page**

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ..................................................... ii

Table of Authorities .................................................................................. v

Statement of Jurisdiction ......................................................................... 1

Statement of the Issues ............................................................................. 1

Statement of the Case ............................................................................... 3

   I. Factual history ................................................................................ 3

      A. An unjust conviction derailed Erma Wilson's future. ............. 6

      B. Midland County, Ralph Petty, and Albert Schorre secured Wilson's conviction by simultaneously employing Petty as a county prosecutor and the presiding judge's law clerk. .................................................. 9

      C. Midland County acknowledged the conflict of interest in Petty's simultaneous employment on both sides of the bench. ................................................................................. 12

      D. In an analogous case, the Texas Court of Criminal Appeals held that Petty's dual employment on both sides of the bench constituted a structural due process violation. .................................................................... 14

   II. Procedural history ...................................................................... 17

Standard of Review .................................................................................. 18

Summary of the Argument ..................................................................... 19

Argument ..................................................................................................... 23

I. *Muhammad v. Close* abrogated *Randell v. Johnson*, so no precedent requires this Court to extend *Heck v. Humphrey*'s claim-channeling favorable termination requirement to noncustodial plaintiffs................................................23

    A. *Randell* extended *Heck* to noncustodial plaintiffs' Section 1983 claims based solely on a mistaken rationale. ...............25

    B. *Muhammad* disavowed and abrogated *Randell*'s mode of analysis, so *Randell* is not binding under this Court's rules of precedent and orderliness.........................................27

II. This Court should not extend *Heck*'s claim-channeling favorable termination requirement to noncustodial plaintiffs. ....32

    A. *Heck* established a claim-channeling rule for custodial plaintiffs based on a reconciliation of the federal habeas statute and Section 1983.........................................................33

    B. Four justices in *Heck*, five in *Spencer v. Kemna*, and four other circuits recognize that *Heck*'s claim-channeling rule for custodial plaintiffs does not extend to noncustodial plaintiffs—whose claims have nowhere to be channeled. ..........................................................................35

    C. Section 1983's text, history, and purpose preclude imposing an atextual exhaustion requirement on noncustodial Section 1983 plaintiffs......................................42

Conclusion .............................................................................47

Certificate of Service .............................................................48

Certificate of Compliance.......................................................49

# Table of Authorities

**Page(s)**

CASES

Ashcroft v. Iqbal,
  556 U.S. 662 (2009) .......................................................... 18

Ballard v. Burton,
  444 F.3d 391 (5th Cir. 2006) ............................................ 30

Black v. Hathaway,
  616 F. App'x 650 (5th Cir. 2015) ...................................... 30

Brecht v. Abrahamson,
  507 U.S. 619 (1993) .......................................................... 31

Burnett v. Grattan,
  468 U.S. 42 (1984) ............................................................ 44

Cohen v. Longshore,
  621 F.3d 1311 (10th Cir. 2010) ........................ 37, 38, 39, 42

Conn. Nat'l Bank v. Germain,
  503 U.S. 249 (1992) ................................................... 33–34, 39

Cooper Indus., Inc. v. Aviall Servs., Inc.,
  543 U.S. 157 (2004) .......................................................... 31

Crittindon v. LeBlanc,
  37 F.4th 177 (5th Cir. 2022) ............................................ 29

DeLeon v. City of Corpus Christi,
  488 F.3d 649 (5th Cir. 2007) ............................................ 30

Delesma v. City of Dallas,
  770 F.2d 1334 (5th Cir. 1985) .......................................... 45

*Entzi v. Redmann*,
485 F.3d 998 (8th Cir. 2007) ............................................................. 38

*Ex parte Young*,
2021 WL 4302528 (Tex. Crim. App. Sept. 22, 2021) ........................ 15

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........................................................................... 33

*Felder v. Casey*,
487 U.S. 131 (1988) ........................................................................... 44

*Figueroa v. Rivera*,
147 F.3d 77 (1st Cir. 1998) ............................................................... 38

*Gahagan v. USCIS*,
911 F.3d 298 (5th Cir. 2018) ....................................................... 30, 31

*Gilles v. Davis*,
427 F.3d 197 (3d Cir. 2005) .............................................................. 38

*Golden State Transit Corp. v. City of Los Angeles*,
493 U.S. 103 (1989) ...................................................................... 43–44

*Harden v. Pataki*,
320 F.3d 1289 (11th Cir. 2003) ......................................................... 38

*Hardin v. Straub*,
490 U.S. 536 (1989) ........................................................................... 44

*Heck v. Humphrey*,
512 U.S. 477 (1994) ................................................................. *passim*

*Hines v. Quillivan*,
982 F.3d 266 (5th Cir. 2020) ............................................................. 18

*Huang v. Johnson*,
251 F.3d 65 (2d Cir. 2001) ..................................................... 37, 38, 40

*In re Bonvillian Marine Serv., Inc.*,
   19 F.4th 787 (5th Cir. 2021) ......................................27, 28

*In re Swift*,
   129 F.3d 792 (5th Cir. 1997) ............................................31

*Jenkins v. Haubert*,
   179 F.3d 19 (2d Cir. 1999) ........................................38, 40

*Johnson v. United States*,
   529 U.S. 694 (2000) ............................................................42

*Mitchum v. Foster*,
   407 U.S. 225 (1972) ............................................................44

*Morris v. McAllester*,
   702 F.3d 187 (5th Cir. 2012) ......................................29, 30

*Morrow v. BOP*,
   610 F.3d 1271 (11th Cir. 2010) ........................................39

*Muhammad v. Close*,
   540 U.S. 749 (2004) .................................................*passim*

*Nance v. Ward*,
   142 S. Ct. 2214 (2022) ..............................................34, 35

*Nonnette v. Small*,
   316 F.3d 872 (9th Cir. 2002) ............................................38

*Patsy v. Bd. of Regents of Fla.*,
   457 U.S. 496 (1982) ............................................................43

*Powers v. Hamilton Cnty. Pub. Def. Comm'n*,
   501 F.3d 592 (6th Cir. 2007) ................................37, 38–39

*Preiser v. Rodriguez*,
   411 U.S. 475 (1973) ............................................................34

*Randell v. Johnson,*
227 F.3d 300 (5th Cir. 2000).....................................*passim*

*Savory v. Cannon,*
947 F.3d 409 (7th Cir. 2020)..............................37, 38, 39, 45

*Spencer v. Kemna,*
523 U.S. 1 (1998)......................................................*passim*

*Stokes v. Sw. Airlines,*
887 F.3d 199 (5th Cir. 2018)...................................27–28, 30

*Sykes v. Tex. Air Corp.,*
834 F.2d 488 (5th Cir. 1987)..........................................31

*Thomas v. Tex. Dep't of Crim. Just.,*
297 F.3d 361 (5th Cir. 2002).......................................30, 31

*United States v. Brune,*
991 F.3d 652 (5th Cir. 2021).......................................30–31

*United States v. Castillo-Rivera,*
853 F.3d 218 (5th Cir. 2017)..........................................31

*United States v. Constante,*
544 F.3d 584 (5th Cir. 2008)..........................................31

*United States v. Dupree,*
57 F.4th 1269 (11th Cir. 2023).....................................28–29

*United States v. Escajeda,*
58 F.4th 184 (5th Cir. 2023)...........................................35

*United States v. Herrera-Alvarez,*
753 F.3d 132 (5th Cir. 2014)..........................................31

*United States v. Mathena,*
23 F.3d 87 (5th Cir. 1994)............................................31

*United States v. Mendoza-Blanco,*
    440 F.3d 264 (5th Cir. 2006) .......................................................... 31

*United States v. Price,*
    383 U.S. 787 (1966) ......................................................................... 44

*Wilkinson v. Dotson,*
    544 U.S. 74 (2005) ........................................................................... 34

*Wilson v. Johnson,*
    535 F.3d 262 (4th Cir. 2008) .......................................... 37, 38, 41–42

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.,*
    550 U.S. 81 (2007) ........................................................................... 42

STATUTES

28 U.S.C. § 1291 ................................................................................... 1

28 U.S.C. § 1331 ................................................................................... 1

28 U.S.C. § 1343 ................................................................................... 1

28 U.S.C. § 2201 ................................................................................... 1

28 U.S.C. § 2202 ................................................................................... 1

28 U.S.C. § 2254 ........................................................................... *passim*

42 U.S.C. § 1983 ........................................................................... *passim*

Tex. Admin. Code § 213.28 .................................................................. 8

OTHER AUTHORITIES

Alexander A. Reinert,
    *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101
    (forthcoming) https://tinyurl.com/QIFlawed-Fnd .............................. 43

## Statement of Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1291. The district court granted all three defendants' motions to dismiss and entered final judgment on October 13, 2022. ROA.374–380. Plaintiff-Appellant Erma Wilson timely filed a notice of appeal on November 8, 2022. ROA.381–382.

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202. This is a civil rights case brought under the Fourteenth Amendment and 42 U.S.C. § 1983, seeking declaratory relief and compensatory and punitive damages. ROA.9–10.

## Statement of the Issues

In *Heck v. Humphrey*, the Supreme Court held, as a matter of inter-statutory reconciliation, that if an individual in state custody seeks to raise a constitutional claim in federal court that necessarily implies the invalidity of her extant state conviction, she must do so under the federal habeas corpus statute rather than § 1983. 512 U.S. 477, 480, 487 (1994).

In *Randell v. Johnson*, this Court held, as its sole rationale, that *Heck* "unequivocally" bars *non*custodial plaintiffs from bringing such conviction-invalidating § 1983 claims too, even though the federal habeas

procedure is unavailable to noncustodial plaintiffs. 227 F.3d 300, 301 (5th Cir. 2000).

But in *Muhammad v. Close*, the Supreme Court subsequently made clear that *Randell*'s sole rationale was wrong the day it was decided: The "unavailability of habeas" may "dispense with the *Heck* requirement," and—contrary to *Randell*'s misreading of *Heck*—the Court never "settle[d] the issue." 540 U.S. 749, 752 n.2 (2004); *cf. Spencer v. Kemna*, 523 U.S. 1 (1998) (five justices writing that *Heck* is properly understood as applying only to custodial plaintiffs).

This Court has never assessed *Muhammad*'s effect on *Randell* or *Randell*'s continued precedential value in a published decision.

The issues presented in this case are:

**1.** Is *Randell* still binding precedent, despite *Muhammad*'s clear statement that *Randell*'s sole rationale—based on a misreading of *Heck*—was wrong the day it was decided? That is, did *Muhammad* abrogate *Randell* by disavowing its rationale and mode of analysis?

**2.** Untethered from *Randell*'s misreading of *Heck*, should this Court hold (like four other circuits) that *Heck* (which channels custodial plaintiffs' conviction-invalidating claims through the federal habeas

statute) does not apply to such claims by at least some noncustodial § 1983 plaintiffs (whose claims have nowhere to be channeled)? That is, does *Heck* simply channel the claims of certain custodial individuals through habeas as a matter of standard statutory reconciliation, or does it impose an atextual exhaustion requirement on noncustodial § 1983 plaintiffs who have no federal habeas remedy (or other federal remedy), including those whose lack of access to the federal habeas remedy is by no fault of their own?

## Statement of the Case

### I.    Factual history

A full account of the facts giving rise to the due process claims in this case is below. As to the substantive issue currently before this Court (i.e., whether *Heck v. Humphrey* imposes an exhaustion and favorable termination requirement on noncustodial plaintiffs' § 1983 damages claims), the pertinent facts are:

Plaintiff-Appellant Erma Wilson was convicted of a crime, but served no prison time for it (receiving a suspended sentence). She learned of the due process violations giving rise to that conviction (and to this case) after her suspended sentence expired (not due to any lack of

diligence, but because the facts had been concealed from her). So she never could—and cannot now—avail herself of any potential federal habeas remedy, or any other federal remedy except a § 1983 damages suit for the violation of her federal constitutional rights.

To expand on those salient facts:

(1) Defendant-Appellee Midland County secured a drug-possession conviction against Ms. Wilson, after the presiding county judge denied her motion to suppress evidence of the drug (which was never seen in her possession). Without considering the merits of that suppression motion, the state appellate court upheld Wilson's conviction. ROA.12–14.

(2) Unbeknownst to Wilson until recently (and therefore never raised in her state court criminal proceedings), Midland County secured her conviction unconstitutionally: by simultaneously employing Defendant-Appellee Ralph Petty as both a county prosecutor and the presiding judge's law clerk—as documented on the docket and in county invoices, and subsequently confirmed by the county. ROA.17–28.

(3) The conflict of interest inherent in that dual-employment arrangement (which, in another case, the Texas Court of Criminal Appeals held constituted a structural due process violation) is the basis

of Wilson's due process claims in this case. Those claims are brought under the federal civil rights statute (§ 1983) against the county, Petty, and Defendant-Appellee Albert Schorre, the district attorney who hired Petty and had him work both sides of the bench in hundreds of cases, including Wilson's. ROA.25, ROA.31–39.

(4) Wilson was never imprisoned for her conviction. She received an eight-year suspended sentence in 2001. ROA.14.

(5) Because no Midland County official or judge ever revealed to Wilson the fact of Petty's dual employment as prosecutor and law clerk, she did not know and could not have been expected to know the unconstitutionality of her conviction until April 2021, after Petty's arrangement working both sides of the bench made national headlines. ROA.21, ROA.25–27.

(6) When Wilson discovered the unconstitutionality of her conviction in 2021, her eight-year suspended sentence had already expired. ROA.25–27.

(7) After discovering the unconstitutionality of her conviction, Wilson timely brought this case, seeking federal relief under the Fourteenth Amendment and § 1983 for Midland County's, Petty's, and

Schorre's violation of her federal due process right to neutral adjudication. ROA.31–39.

(8) For purposes of any potential federal habeas remedy, Wilson was neither imprisoned nor under supervision when she learned of the unconstitutionality of her conviction, when she brought this case, nor now—and therefore ineligible for federal habeas relief. ROA.14, ROA.25.

(9) Under state law, Wilson's unconstitutionally secured conviction impedes her lifelong dream of becoming a registered nurse. Without that conviction, she would already be a registered nurse. ROA.15–17.

A fuller account of the facts:

## A. An unjust conviction derailed Erma Wilson's future.

Midland County, Ralph Petty, and Albert Schorre convicted Erma Wilson (of a crime she did not commit) by simultaneously employing Petty as a county prosecutor and a law clerk to the judge presiding over Wilson's case. Under state law, that conviction impedes Wilson's lifelong dream of a career as a registered nurse.

1. In 2000, Midland County charged Wilson with possession of a controlled substance after officers allegedly found crack cocaine near where she previously stood. ROA.11–13.

The officers initially told Wilson they would let her go if she told them who the drugs belonged to. ROA.13. Wilson did not know, so they arrested her, even though both officers later admitted: they did not see Wilson in possession of the substance; they did not see her throw or drop anything on the ground; she did not appear to be under the influence of any substance; she had no drug paraphernalia; and she did not have exclusive control of the area where the drugs were allegedly found. ROA.12–13.

The county offered Wilson probation in exchange for a guilty plea, but she rejected the offer. ROA.13. Instead of falsely admitting to a crime she did not commit, Wilson maintained her innocence and proceeded to trial in Midland County court, where her case was assigned to the late Judge Hyde. ROA.13.

2. Wilson filed a pretrial motion to suppress the drug that was allegedly found where she once stood. Judge Hyde denied that motion and a motion for reconsideration. ROA.13–14. Therefore, following a jury trial at which the disputed evidence was introduced and emphasized, Wilson was found guilty of "possession of a controlled substance, to-wit: cocaine," a second-degree felony. ROA.14.

Wilson was not sentenced to prison; she received an eight-year suspended sentence. ROA.14. Judge Hyde signed the order of judgment, setting forth the terms of Wilson's community supervision, on July 20, 2001. ROA.14. Wilson then moved for a new trial, which was also denied. ROA.14.

Even though she received only a suspended sentence, Wilson kept trying to vindicate her innocence. She appealed, challenging the trial court's denial of her motion to suppress and the insufficiency of the evidence against her. ROA.14. But the state court of appeals affirmed, finding that her first argument was inadequately preserved and that her second argument did not surmount the extremely deferential review accorded to jury verdicts. ROA.14.

3. With her conviction affirmed, Wilson's fate was sealed: She was barred from her lifelong dream of becoming a registered nurse because Texas Administrative Code § 213.28 provides that "[a]n individual is subject to denial of licensure for . . . a felony that is directly related to the practice of nursing," including drug possession. ROA.15.

Wilson was and remains devasted, and the conviction has had myriad ill effects on her and her family's life. ROA.29–30. But she has

persevered and stayed in the medical field, previously as a certified nursing assistant and home health aide specializing in elder and hospice care, and currently as a state-certified medical assistant. ROA.15–17.

If Wilson did not have the Midland County conviction on her record, she would be a registered nurse today—a career in which her employers agree she would thrive. ROA.16–17.

### B. Midland County, Ralph Petty, and Albert Schorre secured Wilson's conviction by simultaneously employing Petty as a county prosecutor and the presiding judge's law clerk.

In prosecuting and convicting Wilson, Midland County and Schorre employed Petty as both a county prosecutor and a law clerk to the presiding county judge. That is: The defendants convicted Wilson with a prosecutor working both sides of the bench.

1. In March 2000, Midland County began employing Petty as a law clerk for various county judges, including Judge Hyde. ROA.17. Petty advised the county judges on legal matters and drafted their orders and opinions. ROA.17.

2. In early 2001, while Petty was still a law clerk to the county judges, Midland County District Attorney Schorre hired Petty as an assistant district attorney for the county. ROA.17.

When he hired Petty, Schorre knew of Petty's employment with the county judges. ROA.17. And Petty's district attorney employment contract expressly noted that he "shall be permitted to continue the performance of legal services for the District Judges of Midland County, Texas and perform such work for the said District Judges as they shall desire and be paid for the same as ordered by the District Judges." ROA.18. That same contract expressly prohibited any employment that "shall conflict with the duties of the Office of the District Attorney of Midland County." ROA.18, ROA.42.

In other words: Midland County and Schorre barred Petty from working with defense attorneys who litigated cases against the district attorney's office, but they permitted him to work for the judges presiding over the district attorney's office's cases—including his own, which he did. ROA.20–21.

3. In 2002, Judge Hyde asked Russel Malm, the Midland County Attorney, "whether or not Mr. Petty could receive additional pay in addition to his district attorney salary for doing work for the District Judges on habeas corpus cases." ROA.18. Malm responded on behalf of the county that Petty could "be paid for this additional work." ROA.18.

In 2008, the county elaborated on Petty's dual role in response to an IRS audit that asked why Petty received both a W-2 and a 1099 from the county. ROA.19. The county explained that it paid Petty for both his role as a county prosecutor and his role as a law clerk to the county judges. ROA.19. The county noted that when "a writ of habeas corpus is filed, post-conviction, [Petty] responds to it for the judges, at their discretion or assignment." But the county did not disclose that Petty opposed those very same habeas petitions on behalf of the prosecution— i.e., that he was the archetypal judge in his own cases. ROA.19.

4. The county also did not disclose that habeas petitions were not the only matters Petty worked from both sides of the bench. ROA.19. To the contrary, he wore both the judicial and prosecutorial hats at all stages of prosecution. ROA.19–21. He was involved in some capacity in almost every case prosecuted by the Midland County district attorney's office, often as an advisor on prosecution strategies, arguments, and filings. ROA.20–21. And at the same time, he advised, performed legal research for, and wrote orders and opinions for the county judges at all stages of the criminal process. The judges even visited Petty at the district attorney's office to seek his advice and opinions on cases. ROA.19–21.

5. During that dual career, Petty worked as both the lead prosecutor and the law clerk on more than 300 cases. ROA.20. And this number says nothing of the countless additional cases in which he worked as a law clerk while advising his fellow prosecutors. ROA.21.

All told, on top of his prosecutorial salary, invoices show that the county paid Petty more than $250,000 as a law clerk to the county judges from 2001 to 2014 and 2017 to 2018. ROA.20.

### C. Midland County acknowledged the conflict of interest in Petty's simultaneous employment on both sides of the bench.

Petty's dual role and conflict of interest were not disclosed to the criminal defendants (like Wilson) or habeas petitioners subjected to it. ROA.21. After Petty's retirement, the county disclosed Petty's conflict of interest to some of those individuals—but not all, and not including Wilson. ROA.22–23.

1. In August 2019, current Midland County District Attorney Laura Nodolf disclosed invoices revealing what the county always knew: Petty spent nearly two decades collecting paychecks as both a county prosecutor and a law clerk to the county judges hearing his and his office's cases. ROA.22.

Further investigation of Petty's conflict of interest revealed that Petty regularly had ex parte communications with county judges on cases prosecuted by his office, and that he surreptitiously drafted hundreds of orders and opinions for county judges, resolving countless consequential disputes in favor of the prosecution (i.e., in favor of his other simultaneous employer). ROA.22. The investigation revealed that Petty uniquely formatted the documents he drafted for county judges—using a sui generis style not otherwise used by the court or by others in the district attorney's office. ROA.22.

2. Nodolf sent undated letters to some of the individuals whose cases were tainted by Petty's dual role. The letters acknowledged the conflict of interest inherent in Petty's simultaneously working both sides of the bench, and that it potentially violated the rules of ethics. Wilson was not among the victims of this unconstitutional system who received a letter. ROA.23.

3. Facing disciplinary proceedings for this misconduct as a member of the bar, Petty filed a "Motion for Acceptance of Resignation as Attorney and Counselor at Law in Lieu of Disciplinary Action" in the Supreme Court of Texas. ROA.23. The court found that Petty engaged in

professional misconduct and concluded that his "resignation is in the best interest of the public, the profession and Weldon Ralph Petty, Jr." It canceled Petty's law license and prohibited him from practicing law in Texas (a meaningless slap on the wrist for the already retired Petty). ROA.23.

**D.**  **In an analogous case, the Texas Court of Criminal Appeals held that Petty's dual employment on both sides of the bench constituted a structural due process violation.**

The Texas Court of Criminal Appeals subsequently held that Petty's simultaneous employment as both a county prosecutor and a law clerk to the presiding judge structurally violated the right to a criminal defendant's fair trial.

1. In 2020, Texas prisoner Clinton Lee Young petitioned in state court for a writ of habeas corpus based on Petty's conflict of interest in simultaneously working both governmental sides of the bench. ROA.24. Seventeen years earlier, Midland County convicted Mr. Young of capital murder and sentenced him to death following a trial at which Petty worked as both a county prosecutor and a law clerk for the presiding county judge (Judge Hyde, who also presided over Wilson's case). ROA.24.

Mr. Young argued that Petty's previously undisclosed conflict of interest resulted in a structural error that denied Mr. Young his Fourteenth Amendment right to due process. ROA.24.

2. In September 2021, the Texas Court of Criminal Appeals unanimously agreed. It vacated Mr. Young's conviction and held:

> Judicial and prosecutorial misconduct—in the form of an undisclosed employment relationship between the trial judge and the prosecutor appearing before him—tainted [Young's] entire proceeding from the outset. As a result, little confidence can be placed in the fairness of the proceedings or the outcome of [Young's] trial. . . . The evidence presented in this case supports only one legal conclusion: that [Young] was deprived of his due process rights to a fair trial and an impartial judge.

ROA.25 (quoting *Ex parte Young*, 2021 WL 4302528 (Tex. Crim. App. Sept. 22, 2021) (unpublished)).

3. That same reasoning and conclusion apply to Wilson's prosecution and conviction because Midland County's records show that Petty also invoiced Judge Hyde for work he performed on Wilsons's case while he was simultaneously a county prosecutor. ROA.26.

On information and belief, Petty worked as Judge Hyde's law clerk throughout Wilson's criminal proceedings, advising Judge Hyde on

Wilson's case. ROA.26–27. Indeed, the Abstract of Disposition and Judgment entered in Wilson's case bear Petty's unique formatting, demonstrating that Petty drafted the documents affirming the jury's verdict and imposing the terms of Wilson's sentence. ROA.26.

Moreover, in his role as a law clerk, Petty engaged in ex parte communications with Judge Hyde concerning Wilson's case. ROA.26. And, on information and belief, he had access to documents and information generally unavailable to prosecutors—while also communicating with and advising his fellow prosecutors in the district attorney's office regarding Wilson's case, both at trial and on appeal. ROA.27.

4. No county official or judge ever informed Wilson or her counsel of Petty's dual role in her case. ROA.27. Unlike some others, Wilson did not even receive a letter from Nodolf disclosing Petty's misconduct well after the fact. ROA.25. Wilson did not learn of Petty's role in her case until April 2021, shortly after USA Today published an exposé regarding Mr. Young's case and Petty's dual employment on both sides of the bench. ROA.25–27.

If Wilson had known of Petty's involvement as both a law clerk and prosecutor in her case, she would have requested Judge Hyde's recusal and a new trial. ROA.27. Instead, she was prosecuted, tried, and convicted in a structurally defective trial where the judge's law clerk was simultaneously employed by and advising the prosecution. ROA.27–28.

As a result, Wilson has long suffered, and continues to suffer, the consequences of a crime she did not commit, including preclusion from her dream career as a registered nurse. ROA.28–30.

## II.   Procedural history

By prosecuting and convicting Wilson with Petty working both the prosecutorial and judicial sides of the bench, Midland County, Petty, and Schorre violated Wilson's Fourteenth Amendment right to due process, just as the Texas Court of Criminal Appeals held that the county violated Mr. Young's. So Wilson filed this lawsuit against Midland County, Petty, and Schorre for declaratory relief and money damages under § 1983.

All three defendants moved to dismiss. They argued that Wilson's § 1983 claims are barred by this Court's interpretation of *Heck v. Humphrey*, 512 U.S. 477 (1994) in *Randell v. Johnson*, 227 F.3d 300 (5th Cir. 2000).

Over Wilson's opposition and objection, the magistrate judge and the district judge agreed with the defendants. They held: (1) Under *Randell*, *Heck*—which imposes a favorable termination requirement for § 1983 claims that necessarily imply the invalidity of an extant state conviction—applies not only to custodial plaintiffs (whose claims *Heck* channels through the federal habeas statute) but also to noncustodial plaintiffs (for whom no federal habeas or any other federal remedy exists, and whose claims have nowhere to be channeled); and (2) *Randell* remains binding even though the Supreme Court subsequently explained, in *Muhammad v. Close*, 540 U.S. 749, 752 n.2 (2004), that *Randell*'s sole rationale (i.e., that *Heck* compelled its holding) was wrong the day it was decided. ROA.325–332, ROA.374–380.

This appeal timely followed.

## Standard of Review

This Court reviews de novo the district court's dismissal of a complaint under Rule 12(b)(6). *Hines v. Quillivan*, 982 F.3d 266, 270–71 (5th Cir. 2020). The Court accepts all facts in the complaint as true and construes them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## Summary of the Argument

Plaintiff-Appellant Erma Wilson seeks damages under § 1983. Unbeknownst to her, Defendants-Appellees secured her (false) drug-possession conviction by employing a prosecutor on both governmental sides of the bench. Specifically, in prosecuting and convicting Wilson, they simultaneously employed Ralph Petty as both assistant district attorney for the prosecuting county and law clerk to the presiding county judge. As held by the Texas Court of Criminal Appeals in another case, that system constituted a structural conflict of interest that violated the Fourteenth Amendment's guarantee of due process in the form of fair and neural criminal adjudication.

Because the defendants concealed the facts of that arrangement from her, Wilson did not learn about their egregiously unconstitutional conduct until after the term of her suspended sentence for the conviction—and therefore any ability to seek federal habeas relief—had passed. At that point, her only federal avenue for the vindication of her federal constitutional rights was a suit for damages under § 1983, which she timely filed.

But the district court held that because Ms. Wilson's § 1983 claims would necessarily imply the invalidity of her improperly-secured conviction, it was bound by a precedent of this Court to dismiss the claims, notwithstanding the fact that Wilson cannot, and never could, avail herself of the sole alternative federal remedy (habeas relief, which is only available to individuals in custody under federal law).

The issues on appeal are: (1) whether the precedent relied on by the district court remains binding, in light of a subsequent Supreme Court decision explaining that the precedent's sole rationale and mode of analysis were always wrong; and (2) if that precedent is no longer binding, whether this Court should join the opinions of six Supreme Court justices and four sister circuits in holding that where federal habeas review is unavailable, a § 1983 cause of action must be (at least where the unavailability of habeas is by no fault of the plaintiff, as here).

The backdrop against which these questions arise is *Heck v. Humphrey*. In *Heck*, the Supreme Court held that individuals in state custody must rely on the specific terms of the federal habeas corpus statute, rather than the general terms of § 1983, to bring constitutional

challenges in federal court that would necessarily imply the invalidity of their extant state conviction or sentence.

Four justices concurred on the understanding that *Heck* established only a claim-channeling rule for custodial plaintiffs, based on the common need to reconcile two potentially overlapping statutes (the federal habeas statute and § 1983). They said that the case did not and should not extend to noncustodial plaintiffs—whose claims have nowhere to be channeled, and for whom § 1983 is the only avenue for federal relief for federal constitutional violations. Five justices in *Spencer v. Kemna* said the same.

Nevertheless, in *Randell v. Johnson*, this Court held that *Heck* "unequivocally" extended to noncustodial plaintiffs too. That was *Randell*'s sole rationale and the extent of its analysis—i.e., that *Heck* had settled the issue of § 1983 viability not only for people in custody who could access federal habeas procedures, but also noncustodial § 1983 plaintiffs with no such access. But in *Muhammad v. Close*, the Supreme Court subsequently explained—contrary to *Randell*'s misreading—that *Heck* did not settle the issue, and that the "unavailability of habeas" may "dispense with the *Heck* requirement."

This Court has never grappled with *Muhammad*'s effect on *Randell* in a published decision. It should do so now. And in accordance with its rules of precedent and orderliness, the Court should hold that because *Muhammad* disavowed *Randell*'s sole rationale and mode of analysis, it abrogated *Randell*—so the district court erred in relying on *Randell* to dismiss Wilson's claims.

Unmoored from *Randell*'s misreading of *Heck*, the Court should go on to hold—in agreement with six Supreme Court justices and four sister circuits—that *Heck* is a claim-channeling rule, not a judicially-imposed, atextual exhaustion requirement on § 1983. As such, *Heck* does not extend to bar the § 1983 claims of noncustodial plaintiffs, for whom access to federal habeas is unavailable. In other words, *Heck*'s federal claim-channeling rule does not extend to those whose claims have nowhere to be channeled.

At the very least, this Court should hold that *Heck* does not extend to § 1983 plaintiffs whose lack of access to federal habeas procedures was by no fault of their own. That narrower holding would still cover Ms. Wilson: The reason she could never access federal habeas procedures was not because of any waiver or lack of diligence on her part; it was because

the defendants concealed their unconstitutional conduct from her. Accordingly, she only learned of the facts giving rise to her constitutional claims after the term of her suspended sentence—and ability to access federal habeas procedures—had expired.

Holding that *Heck*'s federal claim-channeling rule does not extend to claims that have nowhere to be channeled is not only the just and logical one under *Heck* and its progeny, but is also compelled by the broad remedial text, history, and purpose of § 1983. This Court should join four of its sister circuits in so holding, reverse the district court's dismissal of Wilson's claims, and remand for further proceedings.

## Argument

## I.  *Muhammad v. Close* abrogated *Randell v. Johnson*, so no precedent requires this Court to extend *Heck v. Humphrey*'s claim-channeling favorable termination requirement to noncustodial plaintiffs.

*Heck v. Humphrey* held that individuals in state custody must bring claims that necessarily imply the invalidity of their extant state conviction or sentence through the federal habeas statute, rather than § 1983. The Court reasoned that this requirement was compelled by the familiar need to harmonize the applicability of two statutes with

potentially similar remedial effects (namely, federal relief for federal constitutional violations committed in state criminal proceedings).

In *Randell v. Johnson*, this Court extended *Heck* to the § 1983 claims of noncustodial individuals (like Wilson), even though they have no federal habeas procedures available. *Randell* reasoned only that *Heck* "unequivocally" compelled that result.

But in *Muhammad v. Close*, the Supreme Court explained—contrary to *Randell*'s misreading—that *Heck* never settled the issue, and that the "unavailability of habeas" may "dispense with the *Heck* requirement." 540 U.S. at 752 n.2. Therefore, under this Court's rules of precedent and orderliness, *Randell* is not binding. *Muhammad* abrogated *Randell* because it disavowed *Randell*'s mode of analysis and made clear that *Randell*'s sole rationale was wrong the day it was decided.

No published decision of this Court has grappled with *Muhammad*'s effect on *Randell*. Untethered from *Randell*'s abrogated misreading of *Heck*, this Court should consider the propriety of extending *Heck*'s federal claim-channeling rule for custodial plaintiffs to noncustodial § 1983 plaintiffs who do not have access to federal habeas procedures.

**A.** ***Randell*** **extended** ***Heck*** **to noncustodial plaintiffs' Section 1983 claims based solely on a mistaken rationale.**

This Court explained in *Randell* that it was applying *Heck* to noncustodial plaintiffs only because it read *Heck* as "unequivocally" requiring that result. But the Supreme Court subsequently explained in *Muhammad* that *Heck* did no such thing, and that the issue has always been unsettled.

**1.** A person may invoke federal court jurisdiction to challenge the constitutionality of a state conviction or sentence in two ways: (1) the federal civil rights statute (42 U.S.C. § 1983), which provides "[e]very person" an unqualified federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws"; and (2) the federal habeas statute (28 U.S.C. § 2254), which provides "a person in custody pursuant to the judgment of a State court" a more limited avenue to challenge the constitutionality of her conviction or sentence, subject to various exhaustion and other procedural requirements.

**2.** The Supreme Court grappled with the "intersection of" those two statutes in *Heck v. Humphrey*. 512 U.S. at 480. To reconcile the statutes,

*Heck* held that a person in custody pursuant to a state conviction must rely on federal habeas procedures—rather than § 1983—to challenge the constitutionality of that custody. Before bringing a § 1983 damages claim that would "necessarily imply the invalidity of his conviction or sentence," a person in custody must "prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87. This became known as *Heck*'s "favorable termination requirement" for custodial would-be § 1983 plaintiffs.

**3.** In *Randell*, this Court extended the favorable termination requirement that *Heck* imposed on custodial plaintiffs to noncustodial plaintiffs' § 1983 damages claims as well—reasoning only that *Heck* "unequivocally" compelled the extension. 227 F.3d at 301.

**4.** But the Supreme Court subsequently explained that *Randell* misread *Heck*: The "unavailability of habeas" may "dispense with the *Heck* requirement," and—contrary to *Randell*'s misreading—the Supreme Court has never "settle[d] the issue." *Muhammad v. Close*, 540

U.S. 749, 752 n.2 (2004); *cf. Spencer v. Kemna*, 523 U.S. 1 (1998) (five justices writing that *Heck* is properly understood as applying only to custodial plaintiffs). Therefore, as explained below, *Muhammad* abrogated *Randell*, and *Randell* is no longer binding.

**B.** ***Muhammad* disavowed and abrogated *Randell*'s mode of analysis, so *Randell* is not binding under this Court's rules of precedent and orderliness.**

This Court has never grappled with *Muhammad*'s effect on *Randell* in a published decision. It should do so here, and hold that *Randell* is not binding in light of *Muhammad*'s abrogation and disavowal of *Randell*'s sole rationale and mode of analysis.

**1.** "Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent. One situation in which this naturally occurs is where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (cleaned up). That is: If "the Supreme Court disavows the mode of analysis on which" this Court's prior precedent relied, this Court has "the authority *and obligation* to declare and implement this

change in the law." *Stokes v. Sw. Airlines*, 887 F.3d 199, 204 (5th Cir. 2018) (citations omitted).

**2.** Here, *Muhammad* is an intervening Supreme Court decision that "disavows [*Randell's*] mode of analysis." *Id.* In deciding whether to extend *Heck* to noncustodial § 1983 plaintiffs, *Randell's* mode of analysis was: *Heck* settled this issue, so we must extend it to individuals for whom habeas is unavailable. But *Muhammad* explains that *Heck* did *not* settle the issue, and that the "unavailability of habeas" may "dispense with the *Heck* requirement." 540 U.S. at 752 n.2.

That "fundamentally changes the focus of the relevant analysis." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th at 792 (cleaned up). *Randell's* mode of analysis was to treat the question as *already decided* by *Heck*, while *Muhammad* requires *evaluating whether Heck should be extended* to cover new circumstances that *Heck* left unsettled. *Randell* neither asked nor answered that question.

Accordingly, this Court has the "authority *and obligation*" to engage in the grappling and analysis that *Muhammad* compels. *Stokes*, 887 F.3d at 204. As the Eleventh Circuit recently held, after the Supreme Court's "clarification" of a precedent's reach, the "mechanical application" of a

pre-clarification analysis "would conflict directly with" the clarifying case. *United States v. Dupree*, 57 F.4th 1269, 1275 (11th Cir. 2023) (en banc). Here: The mechanical application of *Randell*'s misreading of *Heck* would conflict directly with *Muhammad*'s clarification that—contrary to *Randell*'s misreading—the Supreme Court never settled whether the unavailability of habeas dispenses with the *Heck* requirement.

**3.** To be sure, a published Fifth Circuit decision has restated *Randell*'s holding post-*Muhammad*. *See Morris v. McAllester*, 702 F.3d 187, 192 (5th Cir. 2012). But *Morris* restated that holding without any discussion of the (mistaken) rationale underlying the holding, or of *Muhammad*'s effect on that rationale. Indeed, a review of the *Morris* opinion and briefing reveals that the panel was not asked to and did not assess (or cite) *Muhammad* at all, let alone its effect on *Randell* or *Randell*'s precedential value. *See id.* & Appellant's Br., No. 12-10333 (5th Cir. May 7, 2012). And, of course, this Court's "task [in *Morris* was] not to come up with arguments the parties should have made, but to decide the ones they [did make]." *Crittindon v. LeBlanc*, 37 F.4th 177, 190 (5th Cir. 2022) (citations omitted).

So *Morris* does not change the analysis above regarding *Muhammad*'s abrogation of *Randell*. "An opinion [*Morris*] restating a prior panel's ruling [*Randell*'s] does not *sub silentio* hold that the prior ruling survived an uncited Supreme Court decision [*Muhammad*]." *Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018).[1]

Stated differently: After *Muhammad* interred *Randell*'s mistaken reading of *Heck* and changed the mode of analysis, *Morris* did not revive *Randell*, because "[w]here an opinion fails to address a question squarely, [this Court] will not treat it as binding precedent." *Thomas v. Tex. Dep't of Crim. Just.*, 297 F.3d 361, 370 n.11 (5th Cir. 2002). Accordingly, because *Morris* "did not analyze whether [*Muhammad*] abrogated [*Randell*'s] rule . . . , [this Court is] not bound by [*Morris*'s] rote

[1] The other two published Fifth Circuit decisions Appellant is aware of that endorse *Randell*'s mistaken rule also did not say (and were not asked to say) anything about *Muhammad*. *See DeLeon v. City of Corpus Christi*, 488 F.3d 649, 654 & n.24 (5th Cir. 2007); *Ballard v. Burton*, 444 F.3d 391, 396 (5th Cir. 2006). The only Fifth Circuit decision to actually assess *Muhammad*'s effect on *Randell* is unpublished and nonprecedential. *See Black v. Hathaway*, 616 F. App'x 650 (5th Cir. 2015). More importantly, it is mistaken: To abrogate *Randell*, *Black* requires that *Muhammad* have definitively settled the question that *Heck* left open, *see id.* at 653–54; but, as explained above, this Court's precedent is clear that *Muhammad* need only have "disavow[ed] the mode of analysis on which" *Randell* relied, which *Muhammad* did do. *Stokes*, 887 F.3d at 204.

recitation[] of [*Randell*'s] rule." *United States v. Brune*, 991 F.3d 652, 664 (5th Cir. 2021).[2]

\* \* \*

After *Muhammad*, *Randell*'s holding that *Heck* "unequivocally" extends to noncustodial § 1983 plaintiffs is not binding. This Court has the authority and obligation to decide that question anew, unmoored from *Randell*'s misreading of *Heck*. For the reasons explained in the next

---

[2] The Supreme Court and several Fifth Circuit panels agree with this approach to precedent and orderliness. *E.g.*, *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (decisions are not precedent on "questions which merely lurk in the record") (cleaned up); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (opinion is not binding precedent on an issue "never squarely addressed" even if the opinion "assumed" one resolution of the issue); *United States v. Herrera-Alvarez*, 753 F.3d 132, 136 (5th Cir. 2014) ("passing statement" regarding a "question [that] was not before the panel" is "not controlling"); *United States v. Constante*, 544 F.3d 584, 586 (5th Cir. 2008) (no precedential effect as to issue not presented and addressed); *In re Swift*, 129 F.3d 792, 796 n.18 (5th Cir. 1997) (no precedential effect as to issue prior panel "did not consider" and "was not raised on appeal").

Candidly, other panels have taken a conflicting approach. *See United States v. Mendoza-Blanco*, 440 F.3d 264, 265 n.7 (5th Cir. 2006); *United States v. Mathena*, 23 F.3d 87, 91 (5th Cir. 1994); *Sykes v. Tex. Air Corp.*, 834 F.2d 488, 492 (5th Cir. 1987).

Sitting en banc, this Court recently declined to resolve these conflicting approaches to precedent and orderliness. *See United States v. Castillo-Rivera*, 853 F.3d 218, 221 n.1 (5th Cir. 2017). For the reasons stated in that case by Judge Smith (joined by six others), Appellant submits that the Supreme Court and *Gahagan/Thomas/Brune/Herrera-Alvarez/Constante/Swift* approach to precedent and orderliness is the right one. *See id.* at 232–37 (Smith, J., dissenting); *see also* Br. of Amicus Curiae Institute for Justice, No. 15-10615 (5th Cir. Dec. 15, 2016), *available at* https://bit.ly/3IWrS5b.

section, this Court should join the four other circuits that do not extend *Heck* to (at least some) noncustodial § 1983 plaintiffs.

## II. This Court should not extend *Heck*'s claim-channeling favorable termination requirement to noncustodial plaintiffs.

In deciding whether *Heck* should be extended to noncustodial § 1983 plaintiffs, the question is whether *Heck* is best understood as creating (1) a claim-channeling rule for custodial plaintiffs based on a reconciliation of the federal habeas statute and § 1983, or (2) an atextual exhaustion rule for all § 1983 plaintiffs, despite the well-settled rule that § 1983 has no exhaustion requirement. It is the former.

Four concurring justices in *Heck*, five justices in *Spencer v. Kemna*, and four other circuits have ably explained why, as a matter of statutory text and purpose, *Heck* is a federal claim-channeling rule—and therefore should not be extended to noncustodial plaintiffs, whose claims have nowhere to be channeled. One of those circuits holds that *Heck* does not extend to any noncustodial plaintiffs. The other three hold that if *Heck*'s claim-channeling rationale can be extended to any noncustodial plaintiffs, it is only those (unlike Wilson here) who realistically and

practically could have availed themselves of federal habeas procedures while in state custody but failed to do so.

Those justices' and circuits' understanding of *Heck* as a claim-channeling rule that does not extend to those whose claims have nowhere to be channeled is compelled by § 1983's text, history, and purpose. This Court should join them.

> **A.** ***Heck* established a claim-channeling rule for custodial plaintiffs based on a reconciliation of the federal habeas statute and Section 1983.**

In *Heck*, the Supreme Court was deciding what to do at the "intersection of the two most fertile sources of federal-court [state] prisoner litigation": the federal civil rights statute (§ 1983) and the federal habeas corpus statute (28 U.S.C. § 2254). 512 U.S. at 480.

In deciding whether state prisoners should be subject to the general terms of § 1983 or the specific terms of § 2254, the Court undertook the "classic judicial task of reconciling [multiple] laws enacted over time, and getting them to 'make sense' in combination." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (citation omitted). Specifically, the Court was faced with the common occurrence of "[r]edundancies across statutes" (i.e., the fact that § 1983 and § 2254 both

provide federal avenues of potential constitutional relief for state prisoners) and the need to "give effect to both." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).

Generally, when reconciling § 1983 and § 2254—"the scope[s] of [which] differ[]"—the Court has "not read § 1983 literally *in the prisoner context*," and has "insisted that § 1983 contains an 'implicit exception' *for actions that lie 'within the core of habeas corpus.'*" *Nance v. Ward*, 142 S. Ct. 2214, 2221 (2022) (emphases added) (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 78–79 (2005)).

And it was based on that core-of-habeas-corpus principle that *Heck* held: "Congress has determined that habeas corpus is the appropriate remedy *for state prisoners* attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983." *Heck*, 512 U.S. at 482 (emphasis added) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 490 (1973)).

In short, *Heck* held that state prisoners must avail themselves of federal habeas procedures instead of § 1983 as a matter of statutory reconciliation and federal claim-channeling for those whose claims can be so channeled. It is a "simple way to avoid collisions at the intersection

of habeas and § 1983." *Spencer v. Kemna*, 523 U.S. 1, 20 (1998) (Souter, J., concurring) (quoting *Heck*, 512 U.S. at 498 (Souter, J., concurring in the judgment)). This Court recently recognized just that. *United States v. Escajeda*, 58 F.4th 184, 186–87 (5th Cir. 2023) (describing *Heck* as an example of statutory reconciliation and claim-channeling); *id.* at 188 (Higginbotham, J., concurring) ("*Heck* plays a habeas-channeling role").

**B.** **Four justices in *Heck*, five in *Spencer v. Kemna*, and four other circuits recognize that *Heck*'s claim-channeling rule for custodial plaintiffs does not extend to noncustodial plaintiffs—whose claims have nowhere to be channeled.**

Of course, a § 1983 claim brought by a person who is not in custody for purposes of § 2254 does not, by definition, "lie within the core of habeas corpus"—and cannot, by definition, be channeled through § 2254. *Cf. Nance*, 142 S. Ct. at 2221 (cleaned up). Indeed, § 1983 is the only federal avenue of potential relief for such a person.

That is why four concurring justices in *Heck*, five justices in *Spencer v. Kemna*, and four other circuits have explained that *Heck* is limited to the claims of individuals for whom § 2254 should realistically and practically have been the first federal stop on their road to constitutional relief. In other words, *Heck* only applies to custodial plaintiffs and

*potentially* to noncustodial plaintiffs who (unlike Wilson here) realistically and practically could have availed themselves of federal habeas procedures but failed to do so.

**1.** Concurring in *Heck* itself, four justices recognized that *Heck*'s federal claim-channeling rule for custodial plaintiffs should not "needlessly place at risk the rights of those outside the intersection of § 1983 and the habeas statute, individuals not 'in custody' for [federal] habeas purposes." 512 U.S. at 500 (Souter, J., joined by Blackmun, Stevens, and O'Connor, JJ., concurring in the judgment).

It would be unjust and illogical "[i]f these individuals (people who were merely fined, for example, or who have completed short terms of imprisonment, probation, or parole, or who discover (through no fault of their own) a constitutional violation after full expiration of their sentences), . . . were required to show the prior invalidation of their convictions or sentences in order to obtain § 1983 damages for unconstitutional conviction or imprisonment." *Id.*

"The better view, then, is that a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-

termination requirement that it would be impossible as a matter of law for him to satisfy. . . . After a prisoner's release from custody, the habeas statute and its exhaustion requirement have nothing to do with his right to any relief." *Spencer*, 523 U.S. at 21 (Souter, J., joined by O'Connor, Ginsburg, Breyer, JJ., concurring).

Or, as Justice Stevens succinctly put it: If a person "does not have a remedy under the [federal] habeas statute, it is perfectly clear, as Justice Souter explains, that he may bring an action under 42 U.S.C. § 1983." *Id.* at 25 n.8 (Stevens, J., dissenting).

**2.** Agreeing with those six justices from *Heck* and *Spencer*, four circuits recognize that *Heck* is simply a federal claim-channeling rule for individuals whose claims actually can be (or actually could have been) channeled through § 2254, and that *Heck* does not extend to the claims of noncustodial plaintiffs whose claims cannot (and could not) be so channeled. *See Huang v. Johnson*, 251 F.3d 65, 73–75 (2d Cir. 2001); *Wilson v. Johnson*, 535 F.3d 262, 265–68 (4th Cir. 2008); *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 599–603 (6th Cir. 2007); *Cohen v. Longshore*, 621 F.3d 1311, 1315–17 (10th Cir. 2010); *see also Savory v. Cannon*, 947 F.3d 409, 431–34 (7th Cir. 2020) (en banc)

(Easterbrook, J., dissenting) (arguing for "the rule proposed by Justice Souter, concurring in *Heck* . . . , under which the end of custody marks the end of deferral" of § 1983 claims).[3]

Those Courts hold that "where federal habeas corpus is not available to address constitutional wrongs, § 1983 must be," *Huang*, 251 F.3d at 75 (quoting *Jenkins v. Haubert*, 179 F.3d 19, 26 (2d Cir. 1999))— "at least where this inability [to seek habeas relief] is not due to the [person's] own lack of diligence," *Cohen*, 621 F.3d at 1316–17. That is because "it would be unjust to place [a noncustodial plaintiff's] claim for relief beyond the scope of § 1983 where 'exactly the same claim could be redressed if brought by a former prisoner who had succeeded in cutting his custody short through habeas.'" *Id.* at 1317 (quoting *Spencer*, 523 U.S. at 21 (Souter, J., concurring)).[4]

---

[3] To be sure, four other circuits do extend *Heck* to noncustodial plaintiffs. *See Figueroa v. Rivera*, 147 F.3d 77 (1st Cir. 1998); *Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005); *Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) (en banc); *Entzi v. Redmann*, 485 F.3d 998 (8th Cir. 2007). Meanwhile, two additional circuits do not extend *Heck* to noncustodial plaintiffs in at least some circumstances. *See Nonnette v. Small*, 316 F.3d 872 (9th Cir. 2002); *Harden v. Pataki*, 320 F.3d 1289 (11th Cir. 2003).

[4] Three of the four circuits that reject the *Heck* bar in circumstances like Wilson's here (the Fourth, Sixth, and Tenth) hold that the bar does apply to noncustodial plaintiffs who (unlike Wilson here) could have realistically and practically pursued federal habeas relief while in state custody but failed to do so. *See Wilson*, 535 F.3d at 268 ("could not, as a practical matter, seek habeas relief"); *Powers*,

**3.** The upshot of *Heck*, *Spencer*, and four other circuits' interpretation of them is that a person's circumstances dictate *which* of two federal avenues for relief from an unconstitutional state court conviction or sentence is available to her, and *when*: (1) If she is in prison for that conviction, then "[r]edundancies across statutes" must be reconciled, *Conn. Nat'l Bank*, 503 U.S. at 253, so her federal avenue for relief is channeled through § 2254. (2) If she is not in prison for that conviction, no such redundancies or need for statutory reconciliation exist, so her federal avenue for relief is § 1983 (at least if she could not previously avail herself of federal habeas procedures)—because she has no other federal avenue for relief available.

---

501 F.3d at 601 ("precluded as a matter of law from seeking habeas redress") (cleaned up); *Cohen*, 621 F.3d at 1317 ("through no lack of diligence on his part").

But "the law might ultimately not turn on that circumstance." *Morrow v. BOP*, 610 F.3d 1271, 1272 n.\* (11th Cir. 2010). Indeed, Judge Easterbrook recently argued (in agreement with Justice Souter, five other justices, and the Second Circuit) that no such diligence or practicality limitation should apply, and that *Heck* should not be extended to *any* noncustodial § 1983 plaintiffs. *Savory*, 947 F.3d at 431 (Easterbrook, J., dissenting) (citing the *Heck* and *Spencer* concurrences and Second Circuit authority).

This Court should adopt the rule pressed by Justice Souter, the Second Circuit, and Judge Easterbrook. Alternatively, it can leave that question for another day. It can simply join the Fourth, Sixth, and Tenth Circuits in holding that *Heck* does not extend to § 1983 plaintiffs who (like Ms. Wilson here) could not realistically and practically pursue federal habeas procedures while in state custody.

Applying those principles to this case, Wilson's due process claims are not *Heck*-barred—even under the approach taken by the Fourth, Sixth, and Tenth Circuits—because, through no fault of her own, she never had (and never will have) access to federal habeas procedures to remedy her unconstitutional state conviction. *Heck*'s federal claim-channeling rule does not apply to Wilson's claims because there never was, is not, and never will be anything to channel.

Midland County, Petty, and Schorre concealed from Wilson the fact that they secured her conviction with Petty simultaneously working both sides of the bench, and she did not learn of that unconstitutional conflict of interest until after her suspended sentence had expired. Due to the very constitutional violation she now complains of, her claims could never have been (and cannot be) vindicated through federal habeas procedures.

That makes this the quintessential case "where federal habeas corpus is not available to address constitutional wrongs, [so] § 1983 must be." *Huang*, 251 F.3d at 75 (quoting *Jenkins*, 179 F.3d at 26). Indeed, Wilson's is one of the scenarios the *Heck* concurrence envisioned as necessitating a properly narrow reading of the case. *See* 512 U.S. at 500 (Souter, J., joined by Blackmun, Stevens, and O'Connor, JJ., concurring

in the judgment) (*Heck* cannot logically or justly extend to those "who discover (through no fault of their own) a constitutional violation after full expiration of their sentences").

Fittingly, the Fourth Circuit explained in the case of another Wilson why "the reasoning employed by the plurality in *Spencer* must prevail in a case, like Wilson's, where an individual would be left without any access to federal court if [her] § 1983 claim was barred":

> [T]he reach and intent of the habeas remedy would not be circumscribed by Wilson's § 1983 claim since [she] filed it after the expiration of [her] sentence. Additionally, the sweeping breadth, "high purposes," and "unique[ness]" of § 1983 would be compromised in an unprincipled manner if it could not be applied here. If a prisoner could not, as a practical matter, seek habeas relief, and after release, was prevented from filing a § 1983 claim, § 1983's purpose of providing litigants with "a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nations," would be severely imperiled. Barring Wilson's claim would leave [her] without access to any judicial forum in which to seek relief for [her] alleged wrongful [conviction and sentence]. Quite simply, we do not believe that a habeas ineligible former [convict] seeking redress for denial of [her] most precious right—freedom—should be left without access to a federal court.

*Wilson*, 535 F.3d at 267–68 (citations omitted). This Court should hold the same. Ms. Wilson should not be left without access to a federal court in seeking vindication of and redress for the defendants' surreptitious denial of her most precious federal constitutional rights.

## C. Section 1983's text, history, and purpose preclude imposing an atextual exhaustion requirement on noncustodial Section 1983 plaintiffs.

The *Heck* and *Spencer* concurrences and their circuit court progeny discussed above are "both more just and more in accordance with the [text, history, and] purpose of § 1983." *Cohen*, 621 F.3d at 1316–17.

This Court's "obligation is to give effect to congressional purpose so long as the congressional language does not itself bar that result." *Johnson v. United States*, 529 U.S. 694, 710 n.10 (2000). "[I]f the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that [is] the end of [the judicial] analysis." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007).

Here, extending *Heck* to noncustodial plaintiffs would amount to the atextual imposition of an exhaustion requirement on § 1983 claims. The Supreme Court has already made clear that, in the absence of inter-statutory reconciliation or federal claim-channeling (which are indeed

absent in the case of noncustodial § 1983 plaintiffs), the statute contains no exhaustion requirements.

**1.** Begin with the text of § 1983, which imposes no procedural barriers to the vindication of federal constitutional rights. The statute provides for an unqualified right of action, with no exhaustion or other procedural limitations:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Given the unqualified text, it has long been settled that exhaustion of other remedies "is not a prerequisite to an action under § 1983." *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 501 (1982).[5] And, of course, "[t]he burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant"; the Court does "not lightly conclude that

---

[5] Indeed, the historical evidence shows that Congress intended for § 1983 to abrogate any common law limitations on the statute's unqualified right to vindicate state-level constitutional violations in federal court. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101 (forthcoming), *available at* https://tinyurl.com/QIFlawed-Fnd.

Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) (cleaned up).

To be sure, the applicability of this broad statute could be affected by other, more specific statutes—which is why *Heck* held that claims for which § 2254 is available must be so channeled. But where, as here, no other statute even arguably applies, § 1983 controls.

**2.** The clear text of § 1983 is not a mistake. Legislative history illustrates that Congress intended to create a broad remedy without any antecedent procedural hurdles:

> [T]he central objective of the Reconstruction-Era civil rights statutes . . . is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief. *Burnett v. Grattan*, 468 U.S. 42, 55 (1984). Thus, § 1983 provides a uniquely federal remedy against incursions . . . upon rights secured by the Constitution and laws of the Nation, *Mitchum v. Foster*, 407 U.S. 225, 239 (1972), and is to be accorded a sweep as broad as its language. *United States v. Price*, 383 U.S. 787, 801 (1966).

*Hardin v. Straub*, 490 U.S. 536, 539 n.5 (1989) (quoting *Felder v. Casey*, 487 U.S. 131, 139 (1988)) (internal quotation marks omitted).

Indeed, the "Supreme Court has identified 'compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law' as the principal policies that Section 1983 embodies." *Delesma v. City of Dallas*, 770 F.2d 1334, 1339–40 (5th Cir. 1985) (citations omitted).

**3.** Expanding *Heck* to bar § 1983 claims by noncustodial plaintiffs would frustrate those policies, not just for plaintiffs who (like Wilson) were never imprisoned, but for countless thousands of others. As Judge Easterbrook recently explained, federal courts "routinely see [habeas] cases in which it has taken a decade to pursue a direct appeal, collateral review in state court, and collateral review in federal court." *Savory*, 947 F.3d at 433 (Easterbook, J., dissenting). If a plaintiff cannot bring a § 1983 claim without first successfully litigating a federal habeas claim, that means "thousands of defendants sentenced to less than five or ten years in prison can *never* present a § 1983 claim, no matter how egregious the constitutional violations that led to wrongful conviction and custody." *Id.* at 433–34.

If Congress meant to impose on § 1983 plaintiffs not only an exhaustion requirement, but an *insurmountable* exhaustion

requirement, the least courts should expect is that Congress would have said so. It has not. *Heck* should not be extended in contravention of Congress's unambiguously expressed text and policies.

\* \* \*

The district court held that this Circuit stands on one side of a long-standing split over the scope of the *Heck* bar. But, as explained above, no published opinion of this Court has ever addressed the actual question presented by that split: whether *Heck* should be extended to cover plaintiffs not eligible for federal habeas relief. And that silence matters because there are powerful arguments—rooted in Supreme Court precedent, the opinions of sister circuits, statutory text, and basic principles of fairness—for answering that question with a "no." No opinion of this Court grapples with these arguments, let alone rejects them. To affirm the district court's dismissal would mean that Erma Wilson—who undisputedly cannot (and never could have) raised her important due process claims via § 2254—is left with no remedy at all. That ruling should be reversed. *Heck*'s federal claim-channeling rule simply has no force with respect to claims that cannot be channeled.

## Conclusion

This Court should reverse the district court's dismissal with respect to all claims against all defendants and remand for further proceedings.

February 13, 2023

Respectfully submitted,

s/ Jaba Tsitsuashvili
Jaba Tsitsuashvili
    *Lead counsel*
Robert J. McNamara
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
(703) 682-9320
jtsitsuashvili@ij.org
rmcnamara@ij.org

*Counsel for Plaintiff-Appellant*

## Certificate of Service

I certify that on February 13, 2023 an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished on all counsel of record by the appellate CM/ECF system.

s/ Jaba Tsitsuashvili
*Lead Counsel for Plaintiff-Appellant*

## Certificate of Compliance

1. This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 9,478 words, as determined by the word-count function of Microsoft Word 2016, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief is written in a proportionally spaced typeface, 14-point Century Schoolbook with 12-point Century Schoolbook footnotes, using Microsoft Word 2016.

s/ Jaba Tsitsuashvili
*Lead Counsel for Plaintiff-Appellant*