# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 13, 2024

Lyle W. Cayce
Clerk

———————

No. 22-50998

———————

Erma Wilson,

*Plaintiff—Appellant,*

*versus*

Midland County, Texas; Weldon (Ralph) Petty, Jr., *sued in his individual capacity*; Albert Schorre, Jr., *sued in his individual capacity*,

*Defendants—Appellees.*

————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:22-CV-85

————————————————————

Before Richman, *Chief Judge,* and King, Jones, Smith, Stewart, Elrod, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, Engelhardt, Oldham, Wilson, Douglas, and Ramirez, *Circuit Judges.*

Andrew S. Oldham, *Circuit Judge,* joined by Richman, *Chief Judge,* and Jones, Smith, Ho, Duncan, Engelhardt, Wilson, and Ramirez, *Circuit Judges:*

Erma Wilson was convicted of cocaine possession and given an eight-year term of supervised release. That felony conviction created an insuperable obstacle to Wilson's life-long dream of becoming a nurse. Then,

No. 22-50998

many years after her sentence expired, Wilson discovered that her criminal trial was tainted by egregious due process violations. State law afforded her numerous avenues for setting aside that conviction, clearing her record, and achieving her nursing dream. But Wilson chose to forgo all of them. She instead sued in federal court for money damages under 42 U.S.C. § 1983. The district court dismissed the suit because § 1983 cannot be used to challenge a "tainted" state-law conviction unless and until that conviction has been set aside, expunged, or otherwise favorably terminated. *See Heck v. Humphrey*, 512 U.S. 477 (1994). We affirm.

I

In 2001, a jury in Midland County, Texas, convicted Erma Wilson of cocaine possession. As a first-time offender, Wilson faced no jail time. She was instead given an eight-year sentence of community supervision. She appealed to the intermediate court of appeals and lost. *See Wilson v. Texas*, No. 08-01-00319-CR, 2003 WL 1564237 (Tex. App.—El Paso Mar. 27, 2003, no pet.). She did not seek review in the Texas Court of Criminal Appeals. She did not seek review in the Supreme Court of the United States. She did not seek postconviction relief under Texas law. And she did not seek relief in federal court under the Anti-terrorism and Effective Death Penalty Act ("AEDPA").

Long after her community-supervision sentence expired, Wilson filed suit in federal court under 42 U.S.C. § 1983. What happened at Wilson's trial 23 years ago was, according to our panel decision, "utterly bonkers." *Wilson v. Midland Cnty.*, 89 F.4th 446, 459 (5th Cir. 2023), *reh'g en banc granted, opinion vacated*, 92 F.4th 1150 (5th Cir. 2024) (mem.). Wilson alleged that, at the time of her trial, a man named "Weldon 'Ralph' Petty Jr. was working *both* as a Midland County prosecutor and as a law clerk for the Midland County district judges." 89 F.4th at 450 (emphasis in original). When Petty's

No. 22-50998

egregious misconduct came to light, he was forced to surrender his law license. And the Texas Court of Criminal Appeals found Petty's misconduct so egregious as to violate due process. *Ex Parte Young*, No. WR-65, 137-05 WL 4302528 (Tex. Crim. App. Sept. 22, 2021) (granting relief to capital defendant convicted in Midland County and remanding for a new trial).

Wilson, though, chose not to seek relief from her conviction. That choice was curious—both because the state courts made clear that their doors were open to overturn Wilson's conviction, and because the entire premise of this lawsuit is that Wilson's criminal conviction created an insuperable obstacle to her lifelong dream of becoming a nurse. *See* 89 F.4th at 448. But for whatever reason, Wilson chose to seek only money damages under 42 U.S.C. § 1983 and attorneys' fees under 42 U.S.C. § 1988. The key allegation in Wilson's complaint, which she repeated for emphasis, was that she was entitled to relief under federal law because her criminal conviction was "tainted" by violations of the Fourteenth Amendment's Due Process Clause.

The federal district court held that, under the *Heck* doctrine, Wilson could not press her § 1983 claim unless and until she received a favorable termination of her cocaine-possession conviction. *See Heck*, 512 U.S. at 486–87. A panel of our court affirmed—but emphasized that it did so only because controlling precedent embraced an "expansive reading" of *Heck*'s favorable-termination requirement. *See Wilson*, 89 F.4th at 459 (citing *Randell v. Johnson*, 227 F.3d 300 (5th Cir. 2000)). The panel urged our en banc court to "relax[]" the favorable-termination requirement by holding that "*Heck* does *not* bar a § 1983 claim when the plaintiff is not in custody." *Id.* at 457 (emphasis in original).

Our en banc court granted rehearing. 92 F.4th 1150 (5th Cir. 2024).

No. 22-50998

II

Wilson's entire case is built on the premise that the favorable-termination requirement applies *only* to custodial plaintiffs. But the favorable-termination requirement is unconcerned with custody. It is instead concerned with *all* § 1983 claims by *all* civil plaintiffs who seek civil remedies against defective criminal processes. We first (A) explain the pre-*Heck* rule and the so-called "collision" between § 1983 and federal habeas law. Then we (B) explain *Heck* itself, which held that favorable termination is an *element* in a § 1983 claim brought by someone like Wilson—regardless of whether she was, is, or never could be "in custody." Finally, we (C) explain that post-*Heck* precedent confirms our understanding of the favorable-termination element.

A

The canonical pre-*Heck* precedent involved a collision between habeas and § 1983. *See Preiser v. Rodriguez*, 411 U.S. 475 (1973). That apparently led some to think that this entire area of law is predicated on such a collision (or avoiding it). But that is wrong.

Start with *Preiser*. In that case, New York state prisoners lost good-time credits in prison disciplinary proceedings. *Id.* at 476. The prisoners brought § 1983 actions attacking the constitutionality of those proceedings. *Ibid.* They sought "injunctive relief to compel restoration of the credits, which in each case would result in their immediate release from confinement in prison." *Id.* at 476–77. The prisoners' claims had obvious textual appeal. After all, the plain text of § 1983 affords injunctive relief to "any citizen of the United States or other person within the jurisdiction thereof" who suffers a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. 42 U.S.C. § 1983. The New York prisoners were citizens protected by that statute; they alleged deprivations of their due process rights; and the prison officials who

No. 22-50998

allegedly committed those due process violations were acting under color of New York state law. Thus, if the Supreme Court simply applied the plain text of § 1983, it would be duty bound to find the prisoners' claims cognizable.

But the Court rejected that approach. Why? Because a wooden approach to § 1983's text would pit it against the federal habeas statute, 28 U.S.C. §§ 2241, *et seq.* The federal habeas statute *also* affords injunctive relief to a prisoner who suffers a deprivation of rights secured by federal law by state actors. *See id.* § 2241(c)(3). That is not to say the statutes are duplicative. To the contrary, they are distinct in two important ways. First, the federal habeas statute is specific: It applies to a specific kind of plaintiff (a prisoner) seeking a specific and exceedingly powerful injunction (release from custody[1]) under specific legal standards unique to habeas (and today include AEDPA). Section 1983 by contrast is general: It applies to constitutional and statutory claimants generally and affords an array of remedies (including a variety of injunctions but also money damages) without regard to the common-law and statutory restrictions on habeas. *See, e.g., Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 501 (1982) (holding that, unlike the federal

---

[1] "At the time of § 1983's adoption, the federal habeas statute mirrored the common-law writ of habeas corpus, in that it authorized a single form of relief: the prisoner's immediate release from custody." *Wilkinson v. Dotson*, 544 U.S. 74, 85 (2005) (Scalia, J., concurring). It is difficult to overstate the power of that habeas injunction:

> The singular habeas remedy of release is a powerful one — so powerful that it transformed the common-law courts from agents of the Crown to independent guardians of liberty. *See, e.g., Darnel's Case*, 3 How. St. Tr. 1 (K.B. 1627). Habeas is so powerful that its 1679 codification in England was the 'second magna carta.' 1 W. Blackstone, Commentaries *133. And today, the habeas remedy is so powerful that it allows federal courts to vitiate long-final judgments from co-sovereign state courts notwithstanding *res judicata* principles that would otherwise apply.

*McNeal v. LeBlanc*, 93 F.4th 840, 842 (5th Cir. 2024) (Oldham, J., dissenting from denial of rehearing en banc).

habeas statute, § 1983 generally does not require exhaustion of state remedies). Second and relatedly, if § 1983 and habeas afforded prisoners like the ones in *Preiser* an unfettered choice of remedies, 100% of them would choose the former because it would afford an injunction without the additional requirements imposed by federal habeas law (like exhaustion, default, abuse of the writ, &c.).

The *Preiser* Court avoided this would-be collision between § 1983 and habeas by holding the specific controls the general: "Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983." 411 U.S. at 490. The Court found the prisoners' suits "fell squarely within [the] traditional scope of habeas corpus," *id.* at 487, because what they really wanted was to get released from confinement sooner than they otherwise would. And the Court explained that habeas corpus was always and forever the *only* remedy for a litigant seeking immediate or speedier release or challenging the "fact or duration of his confinement" in prison. *Id.* at 489.

Accordingly, the *Preiser* Court identified "an implicit exception from § 1983's otherwise broad scope for actions that lie 'within the core of habeas corpus.'" *Wilkinson*, 544 U.S. at 79 (quoting *Preiser*, 411 U.S. at 487); *accord Heck*, 512 U.S. at 481 (explaining that *Preiser* rendered habeas-type claims "not *cognizable*" under § 1983). That is, the *Preiser* Court avoided a conflict between § 1983 and habeas by reading an exception into the former for claims that sound in the latter:

No. 22-50998



While *Preiser* carved habeas claims out from § 1983's scope, some of its language created confusion that the Court would later be forced to clarify. For example, the *Preiser* Court suggested that *any* suit attacking the "validity of the fact or length of [a prisoner's] confinement" must be brought in habeas. 411 U.S. at 490. Does that include damages claims? The *Preiser* Court suggested no because damages are not "an appropriate or available federal remedy" in habeas. *Id.* at 494. But because the New York good-time-credit plaintiffs sought only injunctive relief, the *Preiser* Court did not have occasion to explain how its rule would map onto damages claims. *Ibid.*

B

The damages question finally reached the Court in *Heck*. In that case, an Indiana state prisoner claimed that county prosecutors engaged in an unlawful investigation and prosecution that tainted his conviction. 512 U.S. at 478–79. He brought a § 1983 action against the officials and sought damages. *Id.* at 479. Importantly, the prisoner did not seek injunctive relief or release from custody. *Ibid.*

No. 22-50998

The Supreme Court held that, when "the invalidity of [a] conviction" is an element of a § 1983 damages claim, the plaintiff cannot bring suit unless and until the conviction is favorably terminated. *Id.* at 481–82. Or put differently, favorable termination is itself an element of any § 1983 claim that seeks money damages for a tainted conviction. *Id.* at 484. Until that tainted conviction is favorably terminated—that is, reversed on direct appeal, expunged by executive process, set aside by a state court of competent jurisdiction, or set aside by a federal habeas court—the § 1983 damages claim does not accrue. *See id.* at 486–87, 489–90. That is because unless and until the tainted conviction is favorably terminated, the facts authorizing the § 1983 damages suit have not come into existence. *See McDonough v. Smith*, 588 U.S. 109, 115 (2019) (explaining that the statute of limitations begins to run "when the plaintiff has a complete and present cause of action" (quotation omitted)); *Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995) ("Under federal law, the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured . . . . A plaintiff need not realize that a legal cause of action exists; a plaintiff need only know the facts that would support a claim." (quotations omitted)).

The Court based that holding in tort law. *See Heck*, 512 U.S. at 483 ("[T]o determine whether there is any bar to the present suit, we look first to the common law of torts."). Reasoning by analogy, the Court looked to the cause of action for malicious prosecution, which has always required proof of favorable termination. *See id.* at 484 (citing a tort treatise and multiple state court decisions). The Court noted that the justifications for this element—finality, consistency, and a distaste for collateral attacks—were present in some of its previous decisions in other contexts. *See id.* at 484–85 (citing, *inter alia*, *Teague v. Lane*, 489 U.S. 288, 308 (1989); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923)). Accordingly, the Court held that:

> [T]he hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution.

*Id.* at 486. The Court went on to outline what we now call the favorable-termination requirement:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is *not* cognizable under § 1983.

*Id.* at 486–87.

The Court concluded its analysis with one final thought. The lower courts had "wrestled" with the question of statutes of limitations. *Id.* at 489. But the majority dismissed this concern. Looking again to sources of tort law, *see ibid.* (citing a treatise and a state court decision), the Court held that this use of § 1983's cause of action would not accrue "until the conviction or sentence has been invalidated." *Id.* at 489–90. To the end of that sentence, the Court appended footnote 10:

> Justice SOUTER also adopts the common-law principle that one cannot use the device of a civil tort action to challenge the validity of an outstanding criminal conviction, but thinks it necessary to abandon that principle in those cases (of which no real-life example comes to mind) involving former state

No. 22-50998

prisoners who, because they are no longer in custody, cannot bring postconviction challenges. *Post*, at 2379. **We think the principle barring collateral attacks—a longstanding and deeply rooted feature of both the common law and our own jurisprudence—is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated.**

*Id.* at 490 n.10 (emphasis added).

*Heck* thus broke quite expressly from *Preiser*. *See id.* at 481–82. *Preiser* suggested that damages claims should *always* be cognizable in § 1983 because money claims obviously do not involve "immediate or more speedy release." 411 U.S. at 494. *Heck* said "[t]hat statement may not be true, however, when establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction." 512 U.S. at 481–82. Instead, *Heck* held such claims are "cognizable" under § 1983 when, and only when, plaintiff's conviction has been favorably terminated. *Id.* at 486–87. Thus, *Heck* created a distinct tort-based schematic for civil claims challenging tainted or defective criminal proceedings[2]:



---

[2] *Heck* itself involved one civil remedy (money damages) and one possible outcome of a criminal proceeding (a conviction). As noted in Part II.C, *infra*, the Court subsequently extended *Heck* to apply not just to money-damages claims but also requests for declaratory relief. And the Court extended *Heck*'s favorable-termination element to apply where the criminal process was tainted and did not lead to a conviction.

No. 22-50998

Among the many crucial takeaways from *Heck* is that this conception of the favorable-termination requirement is fundamentally different from *Preiser*'s. *Compare supra*, at 7 (*Preiser* schematic). Favorable termination is an element of a civil claim, so § 1983 plaintiffs must prove it like any other element of the underlying claim. Not because § 1983 damages would otherwise conflict with the core of the habeas corpus statute. *Cf. Preiser*, 411 U.S. at 487, 490. Nor because Roy Heck just so happened to be in custody when he filed suit. *Cf. id.* at 487. But rather because the common law has long precluded tort suits that would undermine criminal proceedings and judgments, *Heck*, 512 U.S. at 483–86—a concern that applies regardless of whether the plaintiff happens to file suit while in or out of custody. *Id.* at 490 n.10.

*Heck*'s understanding of the favorable-termination element has deep roots in tort law. Three historical points bear emphasis.

First, malicious prosecution provides the only tort remedy for civil damages arising from errors in a criminal proceeding. *See, e.g.*, James Wallace Bryan, The Development of the English Law of Conspiracy 27–28 (1909) (noting malicious prosecution "complete[ly] displace[d]" other remedies); *Davis v. Brady*, 291 S.W. 412, 413 (Ky. 1927) (describing malicious prosecution as a "disfavor[ed]" tort, which "has been hedged about by limitations more stringent than those in the case of almost any other act causing damage to another," and the only civil remedy for unlawful initiation of criminal proceedings (quotation omitted)). True, there are other common-law remedies that are sometimes confused with malicious prosecution. *See, e.g.*, *Glidewell v. Murray-Lacy & Co.*, 98 S.E. 665, 667 (Va. 1919) (noting the "considerable confusion" (quotation omitted)). Abuse of process is the most frequent culprit. *See ibid.* But abuse of process involves errors *outside* the criminal process. An obvious illustration is when a person commits a crime, is properly prosecuted for the crime, and lawfully convicted

No. 22-50998

of the crime—but in the process is beaten or starved or otherwise victimized in ways unconnected to the underlying criminal charge:

> For example, if, after an arrest upon civil or criminal process, the party arrested in [sic] subjected to unwarrantable insult and indignities, is treated with cruelty, is deprived of proper food, or is otherwise treated with oppression and undue hardship, he has a remedy [for abuse of process] by an action against the officer, and against others who may unite with the officer in doing the wrong.

*Wood v. Bailey*, 11 N.E. 567, 576 (Mass. 1887). Abuse of process is a distinct tort, with distinct elements, because unlike malicious prosecution, it does not claim the entire underlying criminal proceeding was tainted by legal error. *See* MARTIN L. NEWELL, TREATISE ON THE LAW OF MALICIOUS PROSECUTION, FALSE IMPRISONMENT, AND THE ABUSE OF LEGAL PROCESS 359 (1892). So when it comes to tort damages for a tainted criminal proceeding, it's malicious prosecution or nothing.

Second, the tort of malicious prosecution dates to 17th century England. *See, e.g.*, *Savile v. Roberts*, 91 Eng. Rep. 1147, 1149–50 (K.B. 1698). The English courts recognized it because preexisting remedies like the writ of conspiracy extended only to *acquitted* defendants. BRYAN, *supra*, at 25–27. Those preexisting remedies provided hollow solace when malicious prosecutors dropped baseless charges or when the conviction was favorably terminated after trial. Thus, the English courts recognized the tort of malicious prosecution to compensate for all damages, starting from the *initiation* of the baseless criminal case: "The damage a person may sustain *by an indictment* may relate either to his person, his reputation, or his property." *Jones v. Gwynn*, 88 Eng. Rep. 699, 700 (K.B. 1713) (emphasis added). Hence, regardless of whether the civil plaintiff is, was, or ever could have been convicted and placed in custody, tort law provides a remedy for "[a] judicial

No. 22-50998

proceeding, instituted by one person against another from wrongful or improper motives, and without probable cause to support it." Newell, *supra*, at 7.

Third, since its inception, the tort of malicious prosecution has included a favorable-termination element: "The proceeding in which [an] abuse occurred must have terminated[] . . . in favor of the party complaining." Joel Prentiss Bishop, Commentaries on the Non-Contract Law 90 (1889). And since the tort's inception, courts have tied the favorable-termination element to the prohibition against using a civil remedy to collaterally attack a criminal proceeding: "[M]alicious prosecution action[s] . . . [would not] be permitted to make a collateral attack upon [a] criminal judgment, which would be 'blowed off by a side-wind.'" William L. Prosser, Handbook on the Law of Torts 867 (1941).

## C

The Supreme Court's subsequent decisions underscore this broad, tort-based conception of the favorable-termination element. Namely, that it applies to all § 1983 suits challenging a tainted conviction or sentence, regardless of whether the plaintiff is in custody.

Start with *Edwards v. Balisok*, 520 U.S. 641 (1997), decided three years post-*Heck*. Jerry Balisok was found guilty of violating state prison rules and, as part of his punishment, lost 30 days' good-time credits. *Id.* at 643. Balisok believed the procedures the prison used in the disciplinary proceeding violated his Fourteenth Amendment due process rights. *Ibid.* So he sued for declaratory relief and money damages under § 1983. *Id.* at 643–44.

What of *Heck*'s favorable-termination requirement? Balisok argued the requirement did not apply to his purely procedural claim. *See id.* at 644–45 (summarizing the litigating position as, "claim[s] challenging only the procedures employed in a disciplinary hearing [are] always cognizable under §

No. 22-50998

1983"). In Balisok's view, *Heck* involved a fundamentally *substantive* claim—that Heck's charge and conviction were "undeserved." *Id.* at 645 (cleaned up); *see also* Restatement (Second) of Torts § 653 (1977) (defining the elements of a malicious-prosecution claim, including that the proceedings are instituted "without probable cause"). By contrast, Balisok "posited that the *procedures* were wrong, but not necessarily that the result was." 520 U.S. at 645. (emphasis added). So, the argument went, *Heck*'s analogy to the malicious prosecution tort (and thus its favorable-termination element) was a poor fit for Balisok's purely procedural claim.[3]

The Court unanimously rejected that cramped, formalist reading of *Heck*. Although Balisok's due process claim did not resemble the malicious prosecution tort in all ways, it resembled the tort in the only way that mattered: Success would "necessarily imply the invalidity of the punishment imposed." *Id.* at 645–48; *accord id.* at 649–50 (Ginsburg, J., joined by Souter and Breyer, JJ., concurring); *cf. Heck*, 512 U.S. 484–87 & nn. 5–6. In other words, *Edwards* made clear *all* § 1983 suits challenging tainted convictions and sentences must run *Heck*'s favorable-termination gauntlet—regardless of whether the alleged taint is procedural or substantive. That is because *all*

---

[3] The dissenting opinion disputes our characterization of the question presented by Balisok's argument. *Post*, at 56 (Willett, J., dissenting). You need not take our word for it; take Balisok's. *See* Brief for Respondent at 8, *Edwards v. Balisok*, 520 U.S. 641 (1997) (No. 95-1352), 1996 WL 492348 ("The common law of torts and specifically the malicious prosecution analogy cited in *Heck* is inapplicable in a § 1983 challenge to procedural due process only. The § 1983 Complaint filed by Mr. Balisok is solely about violations of due process procedure."); *id.* at 27–28 ("Petitioners' argument that a prisoner should be required to obtain reversal of the results of a hearing before challenging unconstitutional procedures is not supported by analogy to tort law or § 1983 itself. Unlike a malicious prosecution claim and the claim at issue in *Heck*, a claim that prison procedures violate the Due Process Clause does not directly challenge the merits of the decision in the proceeding."). The Court easily rejected this argument, as the dissenting opinion appears to recognize. *See post*, at 56 (Willett, J., dissenting).

No. 22-50998

such claims, if successful, would undermine the validity and finality of the criminal proceeding.[4]

The Supreme Court recently reaffirmed this interpretation of *Heck*'s favorable-termination element. In *McDonough v. Smith*, Edward McDonough alleged that prosecutor Youel Smith fabricated evidence and used it to pursue criminal corruption charges against him. 588 U.S. at 112–13. The jury eventually acquitted McDonough. *Id.* at 113. McDonough then sued prosecutor Smith under § 1983, claiming Smith's use of fabricated evidence violated his constitutional rights. *Ibid.*

The Court reaffirmed *Edwards* and held favorable termination was an element in McDonough's procedural claim. *Id.* at 116–17, 125. A claim cannot accrue until the plaintiff has or should have the means to prove each element, so it necessarily followed that McDonough's fabricated-evidence claim could not accrue until he was acquitted. *Id.* at 116–17. In so holding, *McDonough* highlighted the extent to which the plaintiff's claim would "challenge the integrity of criminal prosecutions undertaken 'pursuant to legal process.'" *Id.* at 117 (quoting *Heck*, 512 U.S. at 484); *id.* at 122 ("It directly challenges—and thus necessarily threatens to impugn—the prosecution itself."). Indeed, *McDonough* treated this as the essential similarity to common-law malicious prosecution, *id.* at 117–19, 122, echoing *Heck*'s and *Edwards*'s teaching that plaintiffs must prove favorable termination whenever they challenge a tainted conviction or sentence, regardless of the specific underlying constitutional claim. *See id.* at 117 n.5 ("[T]wo constitutional claims may differ yet still both resemble malicious prosecution more than any other common-law tort;

_____

[4] This point bears repeating. While *Heck* emphasized the specific cause of malicious prosecution, *Edwards* held that all § 1983 suits that necessarily imply the invalidity of a past conviction or sentence must achieve favorable termination, whether such suits are wholly analogous to malicious prosecution or not.

No. 22-50998

comparing constitutional and common-law torts is not a one-to-one matching exercise.").

*McDonough* is also instructive in two other ways.

First, it amplified *Heck*'s tort-element schematic—not *Preiser*'s habeas-collision schematic. Following *Heck*'s lead, the *McDonough* Court emphasized that favorable termination was a necessary element of McDonough's § 1983 claim—so much so that his limitations period commenced from the date of favorable termination (here, his acquittal). *Id.* at 114, 119–20 (noting the limitations period begins when a cause of action is complete). And further mirroring *Heck*, not *Preiser*, *McDonough* emphasized the common law of torts has long required favorable termination in analogous contexts. *Id.* at 114–19.

True, the favorable-termination requirement obliquely protects the habeas statute by prohibiting custodial plaintiffs from collaterally attacking their convictions. *Id.* at 119. But it sweeps far wider. That's because favorable termination is an element of *all* § 1983 claims challenging tainted criminal prosecutions, convictions, and sentences, not just those filed by litigants subject to the habeas statute. That is why the Court distinguished between *Heck*'s tort principle and *Preiser*'s habeas principle, which are separate and independent justifications for requiring favorable termination: "This [favorable-termination] conclusion follows **both** from the rule for the most natural common-law analogy (the tort of malicious prosecution) **and** from the practical considerations that have previously led this Court to defer accrual of claims that would otherwise constitute an untenable collateral attack on a criminal judgment." *McDonough*, 588 U.S. at 114 (emphasis added). In this way, it vindicates the broader principles justifying the rule at common law: protecting the finality of criminal judgments, preventing inconsistent civil and criminal proceedings, and avoiding friction between state and federal

No. 22-50998

courts. *Id.* at 117–18. And of course, finality, consistency, federalism, and comity are threatened whenever one brings a civil challenge to a criminal conviction, sentence, or prosecution. *Accord Savory v. Cannon*, 947 F.3d 409, 431 (7th Cir. 2020) (en banc) ("*McDonough* confirms that habeas exclusivity is just one part of the rationale for *Heck*'s holding. Concerns about comity, finality, conflicting judgments, and 'the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments' all underpin *Heck*'s favorable termination rule."); *see also Vega v. Tekoh*, 597 U.S. 134, 151–52 (2022).

Second, and relatedly, *McDonough* undermined (if not completely eliminated) any suggestion that the favorable-termination element is required only when the § 1983 plaintiff is in custody. McDonough filed suit outside of custody—three years *after* he had been acquitted of all charges. *Id.* at 113. McDonough was not even in custody before or during his trial. *Ibid.* Yet the Court nevertheless applied the favorable-termination rule. Relying on this aspect of *McDonough*, the en banc Seventh Circuit observed the following:

> Because McDonough (who was not held in custody during his trials) was acquitted rather than convicted, his section 1983 claim would not have infringed upon the exclusivity of the habeas corpus remedy. The Court nevertheless indicated that the other concerns discussed in *Heck* still guided the outcome, and no section 1983 claim could proceed until the criminal proceeding ended in the defendant's favor or the resulting conviction was invalidated within the meaning of *Heck* . . . . [Accordingly,] *Heck* controls the outcome where a section 1983 claim implies the invalidity of the conviction or the sentence, regardless of the availability of habeas relief.

*Savory*, 947 F.3d at 418, 430; *accord id.* at 421–22. *McDonough* thus followed *Heck*'s footnote 10 and held the favorable-termination requirement does not begin and end with the habeas statute, which is why it "is not rendered

No. 22-50998

inapplicable by the fortuity that a convicted criminal is no longer incarcerated." *Heck*, 512 U.S. at 490 n.10. So even if it was proper for an inferior court to discount *Heck*'s footnote 10 as "infamous" and "the very quintessence of dicta" when the Court decided it, *post*, at 37 (Willett, J., dissenting), *McDonough* makes the Court's instructions impossible to ignore.

Nor is *McDonough* aberrational in this regard. Three years later, in *Thompson v. Clark*, 596 U.S. 36 (2022), the Court once again subjected a non-custodial plaintiff to the *Heck* bar. The prosecutor dismissed all charges against Thompson, so he obviously was not in custody. *Id.* at 39. But he still had to show favorable termination. *Id.* at 44. Today, it should be clear beyond cavil that the favorable-termination element applies regardless of whether the § 1983 claimant was, is, or never could be in custody.

\*

In sum, *Heck*'s favorable-termination requirement is rooted in tort law principles that apply both inside and outside of prison—not habeas principles. That's why favorable termination is an element of any and all § 1983 claims challenging tainted convictions, sentences, or prosecutions. It's also why *Heck*'s footnote 10 followed logically from the Court's tort-based reasoning. *See Savory*, 947 F.3d at 421–22. Custodial status, in other words, matters not.

## III

Applying these principles here, Wilson's § 1983 claim is not cognizable.

Wilson seeks money damages and declaratory relief for her "tainted" felony conviction and resulting sentence. *Wilson*, 89 F.4th at 451 & n.8. Specifically, she alleges that one man (Petty) served as both a law clerk and a prosecutor, which created "a structurally defective system that violated her

No. 22-50998

constitutional right to a criminal proceeding free of actual or perceived bias." *Id.* at 451. And as Wilson herself recognizes, success on her § 1983 suit would "necessarily imply" the invalidity of her criminal proceedings and punishment. *See Heck*, 512 U.S. at 487; *McDonough*, 588 U.S. at 119 ("[McDonough's] claims challenge the validity of the criminal proceedings against him in essentially the same manner as the plaintiff in *Heck* challenged the validity of his conviction."); *Savory*, 947 F.3d at 417 ("There is no logical way to reconcile those claims with a valid conviction."); Appellant's EB Brief at 16 ("[T]here is no dispute about *Heck*'s threshold inquiry: whether Wilson's claim implies the unconstitutionality of her conviction and sentence. It does."). Thus, favorable termination is an element of her § 1983 due process claim. *See Edwards*, 520 U.S. at 644–48. But Wilson has not yet won favorable termination, so her claim has not accrued.

As an initial matter, it bears emphasis that a non-custodial prisoner sentenced only to community supervision has numerous avenues for pursuing the favorable termination required by *Heck*:

- Direct review in the Texas Court of Criminal Appeals. *See* Tex. Code Crim. Proc. art. 4.04, § 2.

- Certiorari in the United States Supreme Court. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821); 28 U.S.C. § 1257.

- Postconviction relief under Texas law. *See* Tex. Code Crim. Proc. art. 11.072, § 2(b).

- Postconviction relief under federal law. *See Sammons v. Rodgers*, 785 F.2d 1343, 1345 (5th Cir. 1986) (per curiam); 17B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4262 (3d ed. Oct. 2023 update).

Wilson pursued none of these options.

No. 22-50998

True, some of these avenues have time limits that elapsed before Wilson discovered the basis for her claim. But that is irrelevant for two reasons.

First, it is not clear that the deadlines are as strict as the dissenting opinion believes them to be. Take for example the 30-day deadline that applies to noticing an appeal to the Texas Court of Criminal Appeals. *See* Tex. R. App. P. 68.2(a). The Court of Criminal Appeals has held that one remedy available in state habeas is "to return Applicant to the point at which he can give notice of appeal"—even if the deadline expired *years* ago. *Mestas v. State*, 214 S.W.3d 1, 2 (Tex. Crim. App. 2007) (quotation omitted).

Second, in all events, Wilson *still* has open avenues under state law—years after completing her sentence. The Governor could pardon Wilson with a recommendation from the Board of Pardons and Paroles. *See* Tex. Const. art. IV, § 11. And Wilson could obtain state habeas relief. *See* Tex. Code Crim. Proc. art. 11.072, § 2(b) ("At the time the application is filed, the applicant must be, *or have been*, on community supervision . . . ." (emphasis added)); *Ex parte Villanueva*, 252 S.W.3d 391, 397 (Tex. Crim. App. 2008) (noting that Article 11.072 encompasses those "who ha[ve] completed a term of community supervision"). Given the low-level nature of her underlying offense, the sympathetic nature of this case, and the attention resulting from her appeal, she might well find relief. *See* En Banc Brief of Texas as Amicus Curiae in Support of Defendant-Appellee at 12 ("Texas has conceded that habeas relief is proper where Petty was, in fact, inappropriately involved in criminal cases."). Again, Wilson pursued none of these options.

Moreover, nothing in this suit prevents Wilson from pursuing favorable termination upon dismissal. As we have explained, "a *Heck* dismissal is a dismissal without prejudice." *Cook v. City of Tyler*, 974 F.3d 537, 539 (5th Cir. 2020) (per curiam). And the district court correctly entered a without-prejudice dismissal here. Practically, that means Wilson is free to secure

favorable termination and then re-raise her claims under § 1983. Until then, her claim is not cognizable and must be dismissed.

## IV

Wilson offers five responses that merit discussion. Most relitigate questions that *Heck* already answered. Some create more issues than they purport to solve. And others would have us exceed our inferior-court commissions. None avails.

## A

First, Wilson contends that her § 1983 suit does not threaten a collision with the federal habeas statute. After all, Wilson is not "in custody," 28 U.S.C. § 2254(a), and she seeks only money damages and declaratory relief—neither of which is available under the habeas statute. This matters, we are told, because *Preiser*'s favorable-termination rule was imposed to prevent collisions between § 1983 and § 2254. Under this line of thinking, success on Wilson's claims would imply her conviction's invalidity, so such claims are not cognizable while she is in prison. But after she is released, any risk of collision between habeas and § 1983 disappears. Thus, the argument goes, *Heck*'s bar has no purchase on non-custodial plaintiffs.

With respect, the above reading of *Heck* is wrong. *Heck* did not extend *Preiser*'s habeas-collision rationale to the rest of § 1983. *See* Part II, *supra*; *Heck*, 512 U.S. at 481 ("This case is clearly not covered by the holding of *Preiser*."). Rather, *Heck* noted that *Preiser* contained inconsistent and shallow dicta on *Heck*'s question presented. *Heck*, 512 U.S. at 482 ("[W]e think the dicta of *Preiser* to be an unreliable, if not an unintelligible, guide."). Instead of parsing *Preiser*'s dicta, *Heck* performed a comprehensive and independent analysis of § 1983—an analysis that relied on the common law of torts, wholly on the common law of torts, and nothing but the common law of torts. *Id.* at 483–90. The upshot? *Whenever* a plaintiff seeks money damages under § 1983

No. 22-50998

for a tainted conviction, sentence, or prosecution (as in *Heck*, *Edwards*, *McDonough*, *Thompson*, and this case), one required element in that backwards-looking tort claim is favorable termination.[5]

The favorable-termination avenues named in *Heck* underscore the depth of the rule's tort roots. *Heck* highlighted four avenues. A § 1983 plaintiff can show her tainted conviction or sentence has been (1) "reversed on direct appeal," (2) "expunged by executive order," (3) "declared invalid by a state tribunal," or (4) "called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 487. Notably, the first three have nothing to do with custody. This case proves the point. *Cf.* Appellant's EB Brief at 34 ("§ 2254 *never* covered Wilson's claim."). Wilson was sentenced to zero days' imprisonment, yet she was nevertheless able to challenge the sentence on direct appeal (avenue 1). Even now, almost twenty years after her community-supervision sentence ended, she can *still* pursue executive clemency (avenue 2) and state post-conviction relief (avenue 3). Or consider *Thompson v. Clark*. There, the Court added a *fifth* favorable-termination avenue: that plaintiff's prosecution ended without a conviction. 596 U.S. at 39. That's yet another favorable-termination avenue that has nothing to do with custody or habeas.

Nor is it surprising that 80% of the favorable-termination avenues require no overlap with habeas or custody. Recall that the favorable-

_____

[5] Conversely, a suit seeking prospective injunctive relief does not implicate *Heck*'s favorable-termination requirement (or, for that matter, *Preiser*'s habeas-channeling rationale). Such a suit challenges only the future enforcement of a law and does not result in "immediate or speedier release into the community" or "necessarily imply the invalidity" of a prior conviction or sentence. *Heck*, 512 U.S. at 481; *cf. Wilkinson*, 544 U.S. at 82 (noting that the "prisoners' claims for *future* [injunctive] relief . . . are yet more distant from" the core of *Heck* (emphasis in original)). Insofar as our pre-*Wilkinson* cases said otherwise, the Supreme Court has since clarified the law.

termination requirement originated in the common law of torts. *See* Parts II.B–C, *supra*. And since its inception, the rule has safeguarded a host of values that are implicated regardless of whether a § 1983 plaintiff attacks her criminal process or punishment from in or out of custody. Because *Heck* is rooted in tort, not habeas, it's only natural that *Heck*'s favorable-termination rule transcends custodial status.

Look to how Justice Souter criticized the majority opinion in *Heck* itself. Justice Souter (joined by three justices) would have analyzed the interplay between § 1983 and § 2254 to determine which statute should give way to the other. *See Heck*, 512 U.S. at 493–502 (Souter, J., concurring in the judgment). But as Justice Souter noted, the majority opinion rejected that approach:

> [I]nstead of analyzing the statutes to determine which should yield to the other at this intersection, *the Court appears to take the position that the statutes were never on a collision course in the first place* because, like the common-law tort of malicious prosecution, § 1983 requires (and, presumably, has always required) plaintiffs seeking damages for unconstitutional conviction or confinement to show the favorable termination of the underlying proceeding.

*Id.* at 492 (Souter, J., concurring in the judgment) (emphasis added). And later in the same concurrence, Justice Souter lamented the majority's reliance upon the common law of torts "alone." *See ibid.* ("[Unlike the majority,] I do not think that the existence of the tort of malicious prosecution alone provides the answer.").

Put simply: *Heck* and *Preiser* announced distinct rules rooted in distinct genealogies. True, *Preiser* and *Heck* are superficially similar in the sense that both charted the boundaries of § 1983. But the similarities end there.

No. 22-50998

*Heck* relied on tort law, while *Preiser* relied on habeas. That's why *Heck* applies outside of prison, while *Preiser* mostly does not.

B

Wilson next contends that we have overread *Heck*. She points to later cases like *Spencer v. Kemna*, 523 U.S. 1 (1998), and *Muhammad v. Close*, 540 U.S. 749 (2004) (per curiam). *See, e.g.*, Appellant's EB Brief at 11–13. Our now-vacated panel opinion echoed this criticism. *See Wilson*, 89 F.4th at 453–55. In our view, neither *Spencer* nor *Close* undermines *Heck*'s tort-law foundation.

In *Spencer*, the Court held that a prisoner could bring a petition for writ of habeas corpus even though he was released from prison before his petition was adjudicated. *See* 523 U.S. at 3–7, 14–18. Because the case involved a § 2254 habeas petition, the majority opinion obviously had no occasion to consider the elements of a nonexistent § 1983 claim. Nevertheless, three non-precedential opinions joined by five justices argued that § 1983's favorable-termination requirement should not extend to non-custodial plaintiffs. *See Spencer*, 523 U.S. at 19 (Souter, J., concurring, joined by O'Connor, J., Ginsburg, J., and Breyer, J.); *id.* at 21 (Ginsburg, J., concurring); *id.* at 25 n.8 (Stevens, J., dissenting).

Six years later in *Close*, the Supreme Court discussed but did not revisit the immaterial question of whether *Heck* applied to non-custodial plaintiffs. *See* 540 U.S. at 752 n.2 ("Members of the Court have expressed the view that unavailability of habeas for other reasons may also dispense with the *Heck* requirement . . . This case is no occasion to settle the issue." (citing Justice Souter's concurrence in *Heck* and Justice Ginsburg's concurrence in *Spencer*)).

The non-custodial question posited but not answered in *Spencer* and *Close* is irrelevant. That is because *Heck* is not a case about custody; it is a

No. 22-50998

case about tort law. And tort law applies inside *and outside* of prison. *See Heck*, 512 U.S. at 490 n.10. That is why *Heck* framed its accrual rule as one focused on the elements of a § 1983 action for damages arising from a tainted conviction—rather than a rule focused on custody, habeas, or anything else. *See Heck*, 512 U.S. at 486-87 (describing the scope of its rule as *any* claim to "recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid"). And even if there was some debate on any of this—such that the issue was not settled in 2004, when *Close* was decided—the debate is settled in 2019, when *McDonough* was decided. In the latter case, the Court applied § 1983's favorable-termination requirement to a non-custodial plaintiff. And that makes perfect sense because, again, the elements of a tort claim have nothing at all to do with the custodial status of the claimant.

True, Justice Souter thought custody should've mattered in *Heck*. And in *Spencer* and *Close*, several justices reiterated their defense of Justice Souter's view of the world. But that does not change *Heck*'s tort-law holding. Nor does it empower our inferior court to disregard Supreme Court precedent, including *McDonough*. *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents.").

C

Wilson next argues that subjecting non-custodial plaintiffs to a favorable-termination requirement would read an atextual exhaustion requirement into § 1983. *See* Appellant's EB Brief at 20–22. The Supreme Court has long held that § 1983 does not require exhaustion of state remedies. *See Patsy*, 457 U.S. at 501; *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019). But *Heck* imposed no such thing. Rather, *Heck* and its progeny have

No. 22-50998

been clear that favorable termination is an "element" of all § 1983 claims challenging tainted criminal proceedings. *See, e.g., Heck*, 512 U.S. at 484. Without it, a claim is not "cognizable"—which is logically, legally, and practically different than saying the claim is not "exhausted." *Id.* at 483; *accord Edwards*, 520 U.S. at 649. *Heck* said it best: "We do not engraft an exhaustion requirement upon § 1983, but rather deny the existence of a cause of action." 512 U.S. at 489. So, absent favorable termination, Wilson doesn't even have a claim to exhaust.

## D

Wilson's next response also focuses on § 1983's text. She says that § 1983's language does not include a favorable-termination requirement, so subjecting her to one would violate the statute's "broad textual command." *Wilson*, 89 F.4th at 450, 459; Appellant's EB Brief at 1, 6, 29.

There's quite a bit wrong with this argument.

To begin, even *Heck*'s fiercest critics agree the favorable-termination requirement applies to *custodial* plaintiffs—though it appears nowhere in the text of § 1983. Even Justice Souter agreed with that limitation, which, for him, followed not from the text of § 1983 but from the interaction between § 1983 and other federal statutes like § 2254. *See Heck*, 512 U.S. at 493–502 (Souter, J., concurring in the judgment). Nor does *Preiser*'s habeas carveout appear anywhere in the text of § 1983 (or § 2254 for that matter). Some might prefer to read § 1983's text as if the habeas statutes do not exist, but no Supreme Court justice has *ever* endorsed such a position. *See, e.g., Nance v. Ward*, 597 U.S. 159, 167 (2022) ("So we have not read § 1983 literally in the prisoner context.").

Regardless, at least after *McDonough*, we have no discretion in the matter. "[The] favorable-termination requirement, the [*Heck*] Court explained, applies *whenever* 'a judgment in favor of the plaintiff would

necessarily imply' that his prior conviction or sentence was invalid." *McDonough*, 588 U.S. at 119 (emphasis added) (quoting *Heck*, 512 U.S. at 487). *Whenever* means *whenever*. And nothing about the favorable-termination element is "rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated." *Heck*, 512 U.S. at 490 n.10; *accord Savory*, 947 F.3d at 420 ("[*Heck*] expressly rejected a rule tied to the end of custody."). Indeed, the only entities that can say otherwise are Congress and the Supreme Court.

But even if we could ignore all relevant Supreme Court precedents and start over from the text and nothing but the text, it is unclear that *Heck* conflicts with § 1983's text. The Civil Rights Act of 1871 provides a cause of action to vindicate certain constitutional torts. *See, e.g.*, *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). *Heck* in turn defined the contours of some of those torts, as they were understood when Congress passed the statute. And it is not as if *Heck* plucked its understanding of the tort element from thin air. As explained above, favorable termination has been part of the relevant tort since its inception in the 17th century. *See* Part II.B, *supra*.

Even if we could hold that *Heck* misunderstood the relevant text and history, and even if we could follow § 1983's "textual command" as Wilson suggests, she might not like where that path ends. Scholars vigorously debate the original meaning of § 1983, with some arguing that a proper understanding of its history would require us to look to state law on official immunities, causation, damages, statutes of limitations, and causes of action. *See* Tyler B. Lindley, *Anachronistic Readings of Section 1983*, 75 Ala. L. Rev. (forthcoming 2024). That might be right or wrong, but one thing is clear: Section 1983's meaning is not easily or quickly deciphered. *Cf.* Randall Bridwell & Ralph U. Whitten, The Constitution and the Common Law 97 (1977) (criticizing modern lawyers' "constant insistence that the language of the cases of the period and the writings about its jurisprudence

No. 22-50998

actually means what one thinks it should mean by modern standards, rather than what it seems to mean as practiced by people of the period"). Given the scope of this debate, and the fraught nature of the historical inquiry, it is particularly perilous to ignore the Supreme Court's precedent governing the statutory text.

Putting aside all of the above, Wilson's just-the-text approach spawns more questions than it answers. Wilson suggests we should dispense with *Heck*'s bar when habeas is "unavailable" or when the § 1983 suit would not otherwise "conflict" with § 2254. Appellant's EB Brief at 8, 14–15, 18–19. But what's the limiting principle? Could a prisoner serve a 40-year prison sentence, get out of jail, then bring a § 1983 claim? Whether he had pursued a direct appeal? What about federal habeas relief? State habeas? Clemency?

Or consider those still in custody. Could a prisoner wait out AEDPA's one-year statute of limitations, then file under § 1983? *See* 28 U.S.C. § 2244(d)(1). Would habeas be "unavailable" at that point? What about AEDPA's other requirements? Could the prisoner claim habeas is "unavailable" because he can't satisfy AEDPA's relitigation bar? *See id.* § 2254(d). What if the prisoner deliberately bypassed state procedural rules and procedurally defaulted the relevant claim? *See id.* § 2254(b); *cf. Fay v. Noia*, 372 U.S. 391, 438 (1963) (embracing deliberate-bypass standard for procedural default), *overruled by Wainwright v. Sykes*, 433 U.S. 72 (1977), *and abrogated by Coleman v. Thompson*, 501 U.S. 722 (1991). When would these claims accrue for statute of limitations purposes? And wouldn't much of this litigation be frivolous, duplicative of previous criminal appeals, and corrosive to the precise finality, consistency, and comity concerns that drove the *Heck* Court? *Cf.* 512 U.S. at 484–86.

Other circuits attempt to avoid any such gamesmanship through a "diligence" requirement. *E.g.*, *Wilson v. Johnson*, 535 F.3d 262 (4th Cir.

No. 22-50998

2008); *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592 (6th Cir. 2007); *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019) (en banc); *Cohen v. Longshore*, 621 F.3d 1311 (10th Cir. 2010); *see* Appellant's EB Brief at 14–15, 31–32. But "diligence" is mentioned nowhere in § 1983. So in the name of vindicating statutory text, Wilson would have us invent an atextual requirement. We reject the invitation.

E

Finally, Wilson claims it would be unfair to force her back into the very state system that injured her. And, if she's unable to win favorable termination there, Wilson says it would be doubly unfair that her § 1983 claim might never accrue. Appellant's EB Brief at 21, 29. Our now-vacated panel opinion made a version of this argument based on Justice Souter's complaints in *Heck*. *Wilson*, 89 F.4th at 453 ("The alternative—the blanket denial of *any* federal forum to those whose federal rights have been violated 'would be an untoward result.'" (quoting *Heck*, 512 U.S. at 500 (Souter, J., concurring in judgment))).

It is inaccurate to call the favorable-termination element "the blanket denial of any federal forum." *Ibid.* Under *Heck*, favorable termination is one element of a § 1983 claim. Unless and until the plaintiff can prove that element, the plaintiff has no claim. That is not the denial of any forum; it's a specification of the federal claim.

True, *Heck* and its progeny offer five avenues for proving that element—and all but one must be done outside of federal court: (1) direct appeal in state court, (2) postconviction relief in state court, (3) discretionary relief by state executive, (4) conclusion of criminal proceedings with no conviction in state court, and (5) § 2254 relief in federal court. *See Heck*, 512 U.S. at 486–87; *Thompson*, 596 U.S. at 44. But that does not deny anyone a "federal

No. 22-50998

forum." It means there is no § 1983 claim to vindicate in *any* forum unless and until the would-be plaintiff can show favorable termination.

In any event, it is not at all clear that Wilson ever suffered "the blanket denial of any federal forum." *Wilson*, 89 F.4th at 453. After exhausting her state remedies at some point during her eight-year supervised-release sentence, it appears Wilson could have sought relief in federal court under § 2254. That is because we have held that a suspended sentence still operates to restrict a defendant's liberty and thus satisfies the custody requirement for federal habeas. *See Sammons*, 785 F.2d at 1345; *accord* 17B WRIGHT & MILLER § 4262 (agreeing with that conclusion). So too with a defendant on parole. *See, e.g.*, *Jones v. Cunningham*, 371 U.S. 236 (1963). And so too with an unexpired supervised-release sentence. *See Ojo v. INS*, 106 F.3d 680, 681 & n.2 (5th Cir. 1997) (relying on *Jones*). Wilson cannot choose to forgo these arguments and then complain that she was denied a federal forum.[6]

---

[6] The dissenting opinion goes a step further and contends that § 1983 guarantees Wilson "*a federal-court remedy* for what she had endured." *Post*, at 64 (Willett, J., dissenting) (emphasis added). This contention ignores myriad federal-courts doctrines. True, in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803), Chief Justice Marshall famously said "where there is a legal right, there is also a legal remedy by suit or action at law, wherever that right is invaded." But Marbury's "legal right" was a statutory—not a constitutional—one. So *Marbury* tells us nothing about constitutional remedies. And "[i]n *numerous* situations, there is no remedy for an acknowledged violation of constitutional rights." RICHARD H. FALLON, JR., JOHN F. MANNING, DANIEL J. MELTZER, & DAVID L. SHAPIRO, HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 330 (7th ed. 2015) (emphasis added). Sovereign immunity, qualified immunity, and the political question doctrine are just some of the ways that legal rights do not always give rise to federal-court remedies. *See ibid.* Limits on federal-court jurisdiction and limits on equitable remedies are others, as *Marbury* itself illustrates. *See Marbury*, 5 U.S. (1 Cranch) at 180 (denying mandamus, despite Marbury's legal right to a commission); HART & WECHSLER, *supra*, at 330 (noting the Constitution mentions only two remedies: habeas corpus and just compensation for takings). Retroactivity doctrines are still another. *See, e.g.*, *Edwards v. Vannoy*, 593 U.S. 255 (2021) (declining to retroactively

No. 22-50998

As for Wilson's concern that she might not be able to show favorable termination now, and hence might not be able to prove her § 1983 claim, *Heck* itself acknowledged this possibility. The *Heck* Court emphasized that § 1983 does *not* provide a remedy for all constitutional violations. 512 U.S. at 490 n.10; *see also Spencer*, 523 U.S. at 17 ("This is a great non sequitur, unless one believes (as we do not) that a § 1983 action for damages must always and everywhere be available."). If it did, the Court's immunity doctrines would make no sense. *See, e.g., Pierson v. Ray*, 386 U.S. 547 (1967) (holding § 1983 didn't abolish immunities). The same goes for the Court's direction that state court decisions can have preclusive effect on § 1983 claims. *See, e.g., Allen v. McCurry*, 449 U.S. 90, 103–05 (1980); *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 341–44 (2005).

All of these doctrines point in the same direction, as the en banc Seventh Circuit held: Section 1983 does not give special priority to a federal forum. *See Savory*, 947 F.3d at 419–20. When invoked to challenge a tainted criminal proceeding, § 1983 includes a favorable-termination requirement. Plaintiffs can satisfy that element in federal court, in state court, or in no court (e.g., through executive expungement).

True, favorable termination is sometimes difficult to satisfy. Undoubtedly, as Wilson worries, some plaintiffs will not be able to do so. *Heck* explains, though, why that high bar must be cleared before seeking civil money damages from a tainted criminal proceeding. The Court sought to avoid parallel litigation on the issue of guilt, preclude the possibility of

------

apply the Sixth Amendment right to a unanimous jury verdict). The unavailability of a federal cause of action is yet another. *See, e.g., Hernandez v. Mesa*, 589 U.S. 93, 103–06 (2020) (declining to extend implied right of action against federal officers). Nor can it be said that § 1983 even guarantees a federal *forum*—to say nothing of a federal-court remedy. *See, e.g., Parratt v. Taylor*, 451 U.S. 527 (1981) (holding prisoner's claim for deprivation of property cannot proceed in federal court).

No. 22-50998

conflicting resolutions arising out of the same proceeding, prevent collateral attacks on criminal convictions through the vehicle of civil suits, and respect concerns for comity, finality, and consistency. *Heck*, 512 U.S. at 485–86; *see also McDonough*, 588 U.S. at 117–19. We cannot ignore these instructions.

\*    \*    \*

As cases like this one illustrate, there are real dangers and real abuses in our criminal justice system. That is why our law gives people like Erma Wilson so many opportunities to favorably terminate their criminal proceedings. Some favorable-termination requirements afforded by state law (like the availability of state postconviction review and a gubernatorial pardon) remain available to people like Wilson long after their convictions become final. And if Wilson successfully avails herself of those remedies against her criminal conviction, she will have recourse to still more remedies afforded by civil law—including § 1983—to seek compensation. Those civil remedies are vitally important because crooked, conflicted, and malicious prosecutors should be forced to pay for the damages they inflict on innocent Americans.

But it is also important that civil plaintiffs do not put the cart before the horse. Criminal proceedings and criminal judgments require criminal remedies—not civil ones. If and when Ms. Wilson pushes aside her criminal conviction, then but only then can she come back to civil court and ask for money. Until then, her § 1983 suit must be dismissed.

AFFIRMED.

22-50998

HAYNES, *Circuit Judge*, joined by STEWART and SOUTHWICK, *Circuit Judges*, concurring in part:

I concur in the judgment and with the majority opinion's conclusion that Wilson's § 1983 claim is not cognizable because she has not pursued other avenues currently available to challenge her conviction. Specifically, Texas law allows people who are "*or have been*[] on community supervision" to file an application for state habeas corpus. Tex. Code Crim. Proc. art. 11.072, § 2(b) (emphasis added). Wilson acknowledges that this state habeas remedy is still available to her, but she has not filed an application. Accordingly, I agree with the majority opinion's decision to affirm the dismissal without prejudice, which gives Wilson the opportunity to pursue favorable termination through state habeas proceedings.

The dissenting opinion suggests that I am arguing that someone filing a § 1983 claim must always pursue state remedies first. But that is not what I am saying. I am saying that the requirement in *Heck v. Humphrey*, 512 U.S. 477 (1994) that a conviction be terminated in some way includes the ability to go to the state. That is, one method to satisfy *Heck* is that the conviction is "declared invalid by a state tribunal authorized to make such a determination." *Id.* at 486-87. Because she has the ability to go to the state of Texas, the notion that Wilson does not have the ability to terminate her conviction is not accurate. Accordingly, I concur in the judgment.

22-50998

Don R. Willett, *Circuit Judge*, joined by King, Elrod, Graves, Higginson, and Douglas, *Circuit Judges*, dissenting.

"*A fair trial in a fair tribunal is a basic requirement of due process.*"[1]

The Constitution's fair-trial requirement is Con Law 101—a bedrock due-process guarantee. In fact, the Framers cared so much about the sanctity of the criminal jury trial that our Constitution specifically mentions it "*twice*—not only in the Sixth Amendment, but also in Article III."[2] And to underscore they *really* meant it—that criminal-justice fairness is sacrosanct—the Founding generation doubled down, enshrining a host of procedural non-negotiables in multiple provisions of the Bill of Rights.[3] Indeed, more words are devoted to We the People's fair-trial right than to any other constitutional guarantee. Safe to say, the Framers were fixated on the adjudication of criminal charges—both the power to bring them and the process for resolving them—and spilled a lot of ink to ensure that the Constitution's inviolable fair-trial guarantee is no "empty promise."[4]

During our Second Founding almost a century later, Congress, besides passing the Fourteenth Amendment, also acted statutorily with a sweeping textual command in the Civil Rights Act of 1871 that rights-

---

[1] *In re Murchison*, 349 U.S. 133, 136 (1955); *see also* U.S. Const. amend. XIV § 2; U.S. Const. amend. V.

[2] *Ramos v. Louisiana*, 590 U.S. 83, 89 (2020).

[3] *See* U.S. Const. amend. IV, V, VI, and VIII.

[4] *Ramos*, 590 U.S. at 98. Strange, then, that the jury-trial right is largely illusory today. *See Wilson v. Midland County*, 89 F.4th 446, 451, *reh'g en banc granted, opinion vacated*, 92 F.4th 1150 (5th Cir. 2023) ("In America's criminal justice system, few cases actually go to trial. The system does not just include plea bargaining; the system is plea bargaining. In Texas, 94% of state convictions result from a guilty or no contest plea. In federal courts, the rate is even higher: in fiscal year 2021, 98.3% of offenders pleaded guilty, an all-time high." (citations omitted)).

No. 22-50998

violators "shall be liable to the party injured."[5] These lofty words, however, are just that—pretty parchment promises—if the judicial fine print of made-up caveats, exceptions, and qualifiers ensures that abuses (and abusers) get a pass, even for the most egregious, conscience-shocking deprivations.

\*    \*    \*

It took Erma Wilson 20 years to learn of the brazen prosecutorial misconduct that laid waste to her fundamental fair-trial right—long after she had been convicted, lost her direct appeal, and served her suspended sentence.[6] The stunning revelation came to light in 2021, when *USA Today* broke the story of a Texas death-row inmate, Clinton Lee Young, whose prosecutor, Weldon "Ralph" Petty Jr., had been moonlighting as a paid law clerk to the judge overseeing Lee's capital trial. Turns out, prosecutor Petty had been clerking for multiple Midland County judges for almost two decades, seeking favorable rulings in judges' public courtrooms by day and surreptitiously drafting those rulings in judges' private chambers by night.[7]

This was a DEFCON 1 legal scandal—a prosecutor being on the judge's payroll—and Wilson learned of Petty's dual-hat arrangement along with the rest of the nation. But for her, it was personal—Petty had been working both sides of the bench during her prosecution. Wilson responded to the belated revelation by suing for damages under 42 U.S.C. § 1983, alleging that Petty's covert side hustle—acting as both accuser and de facto

---

[5] 42 U.S.C. § 1983.

[6] At the 12(b)(6) stage, we take Wilson's well-pleaded allegations as true. *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020).

[7] Jessica Priest, *Moonlighting Prosecutor Sent Texas Man to Death Row; 17 Years Later, He Could Get a New Trial*, USA TODAY (Feb. 4, 2021, 9:12 AM), https://www.usatoday.com/in-depth/news/investigations/2021/02/04/texas-death-row-inmate-could-get-new-trial/4255647001/.

No. 22-50998

adjudicator—flattened her due process rights under the Fourteenth Amendment.[8]

The district court dismissed Wilson's claim based on *Heck v. Humphrey*, a 1994 Supreme Court case in which the plaintiff–prisoner brought a § 1983 damages suit analogous to a malicious-prosecution claim.[9] In *Heck*, the Court "famously—and unanimously—established the favorable-termination rule: A state inmate's § 1983 suit is 'not cognizable' unless the inmate first shows a 'favorable termination' to his criminal conviction or confinement."[10] However, "the Court splintered 5–4 over the rule's reach and rigidity."[11]

Today's en banc case poses one—and only one—question: Does *Heck v. Humphrey*'s favorable-termination rule apply to noncustodial § 1983 plaintiffs? This question has been hotly debated in the lower courts since *Heck* was decided three decades ago. Footnoted dicta and vehement concurrences from various Supreme Court justices over the years have played starring roles. The unsurprising upshot is a deep and enduring circuit

---

[8] Specifically, she alleged that that she "was a victim of Petty's conflict of interest" because County records show that Petty invoiced the judge "for work he performed on [her] case while he was employed by the DA's office," Petty's unique formatting and style was used on the abstract of disposition and judgment in her case, Petty had ex parte communications with the judge about her case, and on information and belief Petty worked as a law clerk to the judge on her case throughout her criminal proceedings, advising the judge while he was advising prosecutors in the DA's office.

[9] 512 U.S. 477 (1994).

[10] *Wilson*, 89 F.4th at 451 (quoting *Heck*, 512 U.S. at 487).

[11] *Id.*

No. 22-50998

split.[12] Indeed, we are the second circuit to take the issue en banc in recent years.[13]

My take: The majority opinion in *Heck* had no reason to address whether the rule applied to plaintiffs who have already completed their sentences because the plaintiff in *Heck* was still in prison. But in infamous footnote 10—the very quintessence of dicta—the Court mused that the favorable-termination requirement should also reach plaintiffs who are no longer incarcerated.[14] The Supreme Court's later admonition in *District of Columbia v. Heller* about latching onto unargued, unbriefed, unconsidered pronouncements has never rung more true: "It is inconceivable that we would rest our interpretation . . . upon such a footnoted dictum in a case where the point was not at issue and was not argued."[15]

Justice Souter's *Heck* concurrence, joined by three of his colleagues, took dead aim at footnote 10. He remarked that noncustodial plaintiffs should not have to prove favorable termination because they fall "outside the intersection of § 1983 and the habeas statute," and the majority's view "would be to deny any federal forum" to plaintiffs who could not possibly obtain favorable termination through federal habeas because the federal

---

[12] *See Figueroa v. Rivera*, 147 F.3d 77, 81 n.3 (1st Cir. 1998); *Huang v. Johnson*, 251 F.3d 65, 73–75 (2d Cir. 2001); *Gilles v. Davis*, 427 F.3d 197, 209–10 (3d Cir. 2005); *Wilson v. Johnson*, 535 F.3d 262, 265–68 (4th Cir. 2008); *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 601–03 (6th Cir. 2007); *Savory v. Cannon*, 947 F.3d 409, 430–31 (7th Cir. 2020); *Entzi v. Redmann*, 485 F.3d 998, 1003 (8th Cir. 2007); *Nonnette v. Small*, 316 F.3d 872, 875–78 (9th Cir. 2002); *Cohen v. Longshore*, 621 F.3d 1311, 1315–17 (10th Cir. 2010).

[13] *See Savory*, 947 F.3d at 411.

[14] *Heck*, 512 U.S. at 490 n.10.

[15] 554 U.S. 570, 625 n.25 (2008).

No. 22-50998

habeas statute requires an individual to be "in custody" to file a claim.[16] Four years later, the justices continued their debate in concurrences and a dissent in *Spencer v. Kemna*,[17] where Justice Ginsburg, who had joined the majority in *Heck*, wrote that she had thought better of it: "Individuals without recourse to the habeas statute because they are not 'in custody' . . . fit within § 1983's 'broad reach.'"[18]

These opinions have teed up spirited lower-court debates over whether *Heck* reaches noncustodial plaintiffs. And notably, the Supreme Court, in its own words, has yet to "settle the issue."[19] As for our circuit, we held in 2020 that noncustodial plaintiffs must show favorable termination in a sparsely reasoned per curiam opinion that was barely over two pages long.[20] In taking this case en banc, we had an opportunity to correct that flawed precedent. Regrettably, we have squandered that opportunity.

With boundless respect for my eminent colleagues, the plurality[21] has disfigured *Heck* to impose a favorable-termination requirement as an "element" for "*all* § 1983 claims by *all* civil plaintiffs who seek civil remedies against defective criminal process."[22] This holding is doubly violative:

---

[16] *Id.* at 500 (Souter, J., concurring in judgment).

[17] 523 U.S. 1 (1998).

[18] *Id.* at 21–22 (Ginsburg, J., concurring) (quoting *Heck*, 512 U.S. at 503 (Souter, J., concurring in judgment)).

[19] *Muhammad v. Close*, 540 U.S. 749, 752 n.2 (2004).

[20] *Randell v. Johnson*, 227 F.3d 300, 301 (5th Cir. 2000) (per curiam).

[21] I use the word "plurality" because Judge Oldham's opinion (supported by nine of eighteen judges) is one vote shy of majority support, and Judge Haynes's concurrence (joined by two judges) concurs "in the judgment."

[22] *Ante*, at 4 (emphasis in original).

No. 22-50998

Americans robbed of their constitutional rights are also robbed of any federal forum to vindicate those rights.

I respectfully dissent and would hold that *Heck*'s favorable-termination rule applies only to custodial § 1983 plaintiffs.

## I

To set the stage for explaining how the plurality goes awry, I'll first discuss the "two most fertile sources of federal-court prisoner litigation"[23]— 28 U.S.C. § 2254 and 42 U.S.C. § 1983—which lie at the core of this dispute. Notably, both statutes "provide access to a federal forum for claims of unconstitutional treatment at the hands of state officials, but they differ in their scope and operation."[24] Next, I'll walk through the pre-*Heck* cases that explore the overlap of the two statutes. The pre-*Heck* landscape shows that the Court was deeply concerned with litigation at the intersection § 2254 and § 1983. In fact, the Court had been engaged in a years-long project to delimit their respective scopes. And contrary to the plurality's assertion,[25] the Court maintained this concern in *Heck* itself.[26] A full understanding of both the statutes and the caselaw will inform how *Heck* should be rightly read.

## A

Section 2254 is the federal habeas corpus statute. Habeas has deep roots in our nation's history[27] and "traditionally has been accepted as the

---

[23] *Heck*, 512 U.S. at 480.

[24] *Id.*

[25] *Ante*, at 7–13.

[26] *Heck*, 512 U.S. at 480–83.

[27] U.S. Const. art. I, § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."); *see also Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973) ("The original view of a

No. 22-50998

specific instrument to obtain release from unlawful confinement, or to deliver someone from unlawful custody."[28] While habeas corpus is a powerful device "for safeguarding individual freedom against arbitrary and lawless state action,"[29] in its codified modern form, federal habeas involves a formidable thicket of doctrines.[30] And importantly, it requires prisoners to exhaust state remedies *before* seeking federal habeas relief.[31]

Not so with § 1983. Written in sweeping terms against a backdrop of horrific violence, terror, and subjugation, this statute of constitutional accountability was meant to *open* courthouse doors, not bolt them shut. Unlike § 2254, § 1983 is worded quite open-endedly, providing a broad cause

———————————————————

habeas corpus attack upon detention under a judicial order was a limited one. The relevant inquiry was confined to determining simply whether or not the committing court had been possessed of jurisdiction. But, over the years, the writ of habeas corpus evolved as a remedy available to effect discharge from any confinement contrary to the Constitution or fundamental law, even though imposed pursuant to conviction by a court of competent jurisdiction." (internal citations omitted)); *Brown v. Davenport*, 596 U.S. 118, 128 (2022) ("Over the centuries a number of writs of habeas corpus evolved at common law to serve a number of different functions. But the most notable among these writs was that of *habeas corpus ad subjiciendum*, often called the 'Great Writ.' When English monarchs jailed their subjects summarily and indefinitely, common-law courts employed the writ as a way to compel the crown to explain its actions—and, if necessary, ensure adequate process, such as a trial, before allowing any further detention." (internal citations omitted)).

[28] 39 Am. Jur. 2d Habeas Corpus § 1; *see also habeas corpus*, Black's Law Dictionary 850 (12th ed. 2024) ("A writ of habeas corpus is "employed to bring a person before a court, most frequently to ensure that the person's imprisonment or detention is not illegal.").

[29] 39 Am. Jur. 2d Habeas Corpus § 1.

[30] *See* John H. Blume, *AEDPA: The "Hype" and the "Bite"*, 91 Cornell L. Rev. 259, 270–71 (2006) (summarizing some of AEDPA's key provisions); Marshall J. Hartman & Jeanette Nyden, *Habeas Corpus and the New Federalism After the Anti-Terrorism and Effective Death Penalty Act of 1996*, 30 J. Marshall L. Rev. 337, 352–386 (1997) (explaining the changes made by AEDPA).

[31] 28 U.S.C. § 2254(b)(1)(A).

of action to "*[e]very person*" who is subject to a "deprivation of [their] rights, privileges, or immunities secured by the Constitution and laws." Its "language is unsubtle and categorical, seemingly erasing any need for unwritten, gap-filling implications, importations, or incorporations."[32] Section 1983 was passed as part of the Civil Rights Act of 1871, which "was the congressional response to widespread lawlessness in the southern states and the inability and unwillingness of state and local officials to curb it."[33]

Importantly, it was "[b]ecause Congress lacked confidence in state institutions, including state courts, [that] it explicitly gave federal courts jurisdiction over the new civil action."[34] The Reconstruction era was a sea change in terms of federal-court access to redress constitutional violations: "From the Judiciary Act of 1789 on, access to the lower federal courts had been largely restricted to citizens exposed to the possible prejudices of tribunals of foreign states. The prevailing assumption had been that the state courts were the appropriate forum for the enforcement of federal law."[35] But with the passage of the transformative new civil action, Congress gave § 1983 plaintiffs a direct path to federal court that did not require the exhaustion of state remedies first. In doing so, Congress put federal courts between states and their citizens—and it did so on purpose.

---

[32] *Rogers v. Jarrett*, 63 F.4th 971, 979–80 (5th Cir. 2023) (WILLETT, J., concurring), *cert. denied*, 144 S. Ct. 193 (2023).

[33] 1 STEVEN H. STEINGLASS, SECTION 1983 LITIGATION IN STATE AND FEDERAL COURTS § 2:2 (2023); *see also Virginia v. Black*, 538 U.S. 343, 353 (2003) (describing the passage of the Civil Rights Act of 1971, which was known as the Ku Klux Klan Act).

[34] STEINGLASS, *supra* note 33, § 2:2.

[35] *II. The Background of Section 1983*, 90 HARV. L. REV. 1137, 1150 (1977).

No. 22-50998

## B

Because § 1983 lacks an exhaustion requirement, prisoners have an understandable "impulse to find a way out of habeas and into § 1983."[36] Partially driven by this reality, before *Heck*, the Court had already begun to delineate the scopes of § 1983 and § 2254. Early in that project, the Court in *Cooper v. Pate* blessed the use of § 1983 for state prisoners challenging the conditions of their confinement.[37]

A few years later, *Preiser v. Rodriguez* presented a tougher question: whether prisoners could use § 1983 instead of habeas to obtain an injunction to restore their good-time credits, and thus obtain earlier (or immediate) release from prison.[38] If the prisoners succeeded, the judgment would require that they be released sooner.[39] This was problematic because habeas corpus was the traditional way prisoners could obtain release from prison.[40] The Court thought that even though the prisoners "came within the literal terms of" § 1983, the "broad" text was "not conclusive" of whether the prisoners could proceed via § 1983.[41] Because the federal habeas corpus statute is "specific," and § 1983 is "general," the Court held that "Congress has determined that habeas is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement."[42]

---

[36] *Nance v. Ward*, 597 U.S. 159, 178 (2022) (BARRETT, J., dissenting).

[37] 378 U.S. 546 (1964) (holding that a § 1983 action alleging that a prisoner was denied privileges enjoyed by other prisoners stated a cause of action).

[38] 411 U.S. 475, 487 (1973).

[39] *Id.*

[40] *Id.* at 489.

[41] *Id.* at 488–89.

[42] *Id.* at 489–90.

No. 22-50998

In the next case, *Wolff v. McDonnell*, prisoners challenged the validity of the procedures used to deny their good-time credits and sought damages through § 1983.[43] Because the claim was "for using the wrong procedures, not for reaching the wrong result," and it "did *not* call into question the lawfulness of" the prisoner's "continuing confinement," the Court determined that the § 1983 damages claim could proceed.[44]

It may already be apparent from this brief recounting that in all these cases, the Court was intensely focused on whether a prisoner's § 1983 claim "call[ed] into question the lawfulness of [his or her] conviction or confinement" and would thus necessitate release from prison, either earlier or immediately.[45] If so (*Preiser*), a prisoner could *not* seek § 1983 damages, but if not (*Cooper* and *Wolff*), a prisoner *could* seek damages. The reason for this is clear: A challenge that would imply the invalidity of a prisoner's conviction or confinement "is just as close to the core of habeas corpus as an attack on the prisoner's conviction, for it goes directly to the constitutionality of his physical confinement itself and seeks either immediate release from that confinement or the shortening of its duration."[46]

These cases also share another feature: They all involve challenges from *prisoners*. The only reason the Court got into the business of defining the respective scopes of § 2254 and § 1983 in the first place is because of their overlap, as both statutes "provide access to a federal forum for claims of unconstitutional treatment at the hands of state officials."[47]

---

[43] 418 U.S. 539, 554–55 (1974).

[44] *Heck*, 512 U.S. at 482–83.

[45] *Id.* at 483.

[46] *Preiser*, 411 U.S. at 489.

[47] *Heck*, 512 U.S. at 480.

No. 22-50998

Respectfully, the plurality misses both of these points. It claims that it is "wrong" to "think that this entire area of law is predicated on such a collision" between these two statutes.[48] But a careful reading of the pre-*Heck* cases demonstrates that the Court was focused on specifying when a prisoner could and couldn't choose § 1983, and its reasoning *always* involved the overlap between the statutes.

Habeas is the elephant in the room whenever the scope of § 1983 is at issue because § 1983, absent carefully specified limits,[49] could sideline the federal habeas statute. But to say that some limits on § 1983 are necessary (because the specific controls the general) is not to establish the validity of the plurality's proposed limitation.[50] And the justification of the plurality's limitation is wanting. It is not based on conflict with another statute. It is seemingly based on protecting a set of values (comity, finality, etc.) that, for 153 years now, § 1983 has always opposed—and intentionally so.

## II

Of course, none of the cases discussed above answered the question teed up in *Heck*: whether a prisoner who does not seek "immediate or speedier release, but monetary damages" may bring a § 1983 damages claim when a successful civil action would, in reality, attack the validity of the prisoner's conviction or confinement.[51] The plurality today asserts that the *Heck* Court held that "favorable termination is itself an element of any § 1983

---

[48] *Ante*, at 4.

[49] And it is seemingly based on a particular element of a particular tort, even though the use of tort analogs requires careful selection of the closest analog to the particular claim at issue. More on this in a bit.

[50] *Ante*, at 26.

[51] *Heck*, 512 U.S. at 481, 490.

claim that seeks money damages for a tainted conviction."[52] But *Heck*'s holding was far more limited. It applies only to prisoners whose claims are closely analogous to malicious prosecution. This is evident because: (1) *Heck* was limited to addressing whether prisoners could use § 1983 to challenge their convictions or confinement; (2) the *Heck* opinion is framed in terms of the overlap between § 1983 and § 2254, which indicates the Court remained acutely concerned about the statutes' respective scopes in *Heck*; and (3) tort law merely served as a "starting point"[53] in *Heck* to determine the elements for the prisoner-plaintiff's specific claims, and it would make little sense to apply its holding more broadly.

## A

A tell-tale point about *Heck*: The word "prisoner" pervades the Court's opinion. Roy Heck was in prison when he brought his § 1983 claim, so the only question before the Court involved custodial plaintiffs. In fact, the Court's opinion opens with this unsubtle reference to Heck's custodial status: "This case presents the question whether a *state prisoner* may challenge the constitutionality of his conviction in a suit for damages under 42 U.S.C. § 1983."[54] The Court went on to say that it was applying a "principle" that concerns what actions are appropriate to challenge "outstanding criminal judgments." It explained,

> We think the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his

---

[52] *Ante*, at 8.

[53] *Heck*, 512 U.S. at 483.

[54] *Id.* at 478 (emphasis added).

No. 22-50998

conviction or confinement, just as it has always applied to actions for malicious prosecution.[55]

A judgment is "[a] court or other tribunal's final determination of the rights and obligations of the parties in a case."[56] And the word "outstanding" means "unpaid, uncollected."[57] It is only while a prisoner is still serving his sentence that it can be said to be "outstanding." Once a prisoner has paid his debt to society by completing his sentence, the judgment is no longer "outstanding." Thus, the use of the term "outstanding criminal judgments" indicates that the Court's holding only applies to prisoners—those who have not yet fully served their sentences.

This straightforward understanding of the Court's holding aligns with the rest of the opinion. Immediately after stating its holding, the Court explains the effect of its decision—again referring only to prisoners: "Thus, when a *state prisoner* seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," and if so, it must then determine whether favorable termination has been met.[58] Given that *Heck* presented a question about prisoners, it is no surprise that the effect of the holding—as the Court itself describes it—is limited to prisoners.

Footnote 10 changes nothing. Footnote 10's statement that "the principle barring collateral attacks . . . is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated"[59] is the apex of

---

[55] *Id.* at 486.

[56] *Judgment*, Black's Law Dictionary 1005 (12th ed. 2024).

[57] *Outstanding*, Black's Law Dictionary 1327 (12th ed. 2024).

[58] *Heck*, 512 U.S. at 487 (emphasis added).

[59] *Id.* at 490 n.10.

dicta—stray musings about something that "was not at issue and was not argued."[60] Our precedent puts it this way: "A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it."[61] As Judge Easterbrook remarked about footnote 10, "a clearer example of dicta is hard to imagine," because the "footnote concerns a subject that had not been briefed by the parties, that did not matter to the disposition of Heck's claim, and that the majority thought would not matter to anyone, ever."[62]

Indeed, it is worth emphasizing that in *Heck* itself, the Court rejected an argument that it should rely on dicta from *Preiser* because that opinion "had no cause to address, and did not carefully consider, the damages question" presented in *Heck*.[63] Precisely the same can be said of *Heck*'s footnote 10.

This case demonstrates why we do not rely on dicta, "an unreliable, if not an unintelligible, guide."[64] The *Heck* Court assumed (wrongly) that custodial status would not matter to anyone. But to Wilson, who only learned of Petty's concealed conflict 20 years after her conviction, custodial status matters greatly. Without presentation by the parties of the issue in a case where custodial status made a difference, it's no wonder the *Heck* Court did

---

[60] *Heller*, 554 U.S. at 625 n.25.

[61] *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns., Inc.*, 761 F.3d 409, 427–28 (5th Cir. 2014) (emphasis added) (quotation marks omitted) (quoting *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004)); *see also United States v. Texas*, 97 F.4th 268, 321 (5th Cir. 2024) (OLDHAM, J., dissenting) (faulting reliance on Supreme Court dicta).

[62] *Savory*, 947 F.3d at 432 (EASTERBROOK, J., dissenting).

[63] *Heck*, 512 U.S. at 482.

[64] *Id.*

No. 22-50998

not have the full picture.[65] Whether favorable termination should apply to noncustodial plaintiffs was not the question presented—much less answered—in *Heck*.

## B

We should also notice that the *Heck* Court introduced its opinion by explaining that "[t]his case lies at the intersection of the two most fertile sources of federal-court *prisoner* litigation—the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983, and the federal habeas statute, 28 U.S.C. § 2254."[66] This sentence shows that the Court viewed the case in terms of the overlap between the two statutes, which of course, has to do with *prisoner* litigation. After explaining that *Preiser* and *Wolff* did not answer the question at issue, the Court also framed the question using the terminology that it had used in its previous opinions that had addressed the overlap between the statutes: "[T]he question posed by § 1983 claims that do call into question the lawfulness of *conviction or confinement* remains open."[67] The Court situated its analysis in *Heck* within its long-running project to determine *when* a prisoner may use § 1983 and when he must use § 2254.

The plurality ignores the Court's framing of the issue when it argues that the *Heck* holding is based only in tort law.[68] The plurality proceeds as if *Preiser*'s discussion of the overlap between § 1983 and § 2254 has been

---

[65] *See United States v. Sineneng-Smith*, 590 US 371, 375 (2020) ("in both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).

[66] *Heck*, 512 U.S. at 480 (emphasis added).

[67] *Id.* at 481–83 (emphasis added).

[68] *Ante*, at 8.

No. 22-50998

overruled.[69] Not so. The *Heck* Court only declined to follow *Preiser* in a narrow respect—it thought that *Preiser*'s comment in dicta that damages should always be available under § 1983 when the prisoner is not seeking release from prison was unreliable because it didn't account for the situation where a successful claim would imply the invalidity of a prisoner's conviction or confinement, and would thus show that the prisoner should be released sooner.[70] The broader points articulated in *Preiser* about the overlap between § 1983 and § 2254 in the prisoner context have not been abandoned by the Court.[71]

The *Heck* Court was clear that *Heck* was the latest in a line of cases that dealt with the overlap between § 1983 and § 2254. And the Court was acutely focused on delineating when a prisoner could use § 1983 instead of § 2254.

C

In contrast to what I have explained thus far, the plurality misreads *Heck* to be "based" only in "tort law." While I agree that tort law had a *role* in *Heck*'s analysis, the plurality elevates tort law to be the *sine qua non* of *Heck*. Respectfully, the plurality misunderstands *Heck* and distorts the Court's precedents on the use of common-law analogs to interpret § 1983 by extending the *Heck* bar without regard to the proper analogous tort.

Tort law came into play in *Heck* because of the nature of § 1983, which has long been recognized to "create[] 'a species of tort liability.'"[72] Because

---

[69] *Ante*, at 10–11.

[70] *Heck*, 512 U.S. at 481–82.

[71] *Preiser*, 411 U.S. at 483–89.

[72] *Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)).

No. 22-50998

§ 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred,'"[73] the Court determined in *Carey v. Piphus* that the common law of torts is "the appropriate starting point for the inquiry under § 1983"[74] because it implements the "principle that a person should be compensated fairly for injuries caused by the violation of his legal rights."[75] On a motion to dismiss a § 1983 claim, the threshold inquiry "requires courts to 'identify the specific constitutional right' at issue."[76] The next step is to "determine the elements of, and rules associated with, an action seeking damages for its violation."[77] It is at this second step that common-law analogs play a role—they help a court determine what a plaintiff must plead in order to survive dismissal.

When courts look for a common-law analog, "[s]ometimes . . . review of [the] common law will lead a court to adopt wholesale the rules that would apply in a suit involving the most analogous tort. But not always."[78] Instead, the Court has instructed that "[c]ommon-law principles are meant to *guide* rather than control the definition of § 1983 claims, serving 'more as a source of inspired examples than of prefabricated components.'"[79] In fact, even if "the common law does not recognize an analogous cause of action," courts must still "adapt[] common-law rules of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right"

---

[73] *Albright*, 510 U.S. at 271 (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

[74] 435 U.S. 247, 257 (1978).

[75] *Id.*

[76] *Manuel*, 580 U.S. at 370 (quoting *Albright*, 510 U.S. at 271).

[77] *Id.*

[78] *Id.* (internal citations omitted).

[79] *Id.* (emphasis added) (quoting *Hartman v. Moore*, 547 U.S. 250, 258 (2006)).

No. 22-50998

because otherwise "[t]he purpose of § 1983 would be defeated."[80] Accordingly, the Court has said, "to further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question."[81]

In sum, the Supreme Court has not viewed the common law as a straitjacket that *restricts* the reach of § 1983, but as a "starting point,"[82] "guide," or "source of inspired examples"[83] that helps courts create rules that *further the purpose* of § 1983—to compensate a person injured by the violation of his legal rights. Respectfully, the plurality loses sight of this, making a three-fold error: (1) misreading *Heck* as adopting the elements of a specific common-law tort as a blanket rule for a huge swath of § 1983 claims; (2) misusing common-law analogs as the be-all-end-all rather than a starting point; and (3) misinterpreting *Heck*'s use of the common law to restrict access to § 1983 to as many plaintiffs as possible. This approach is incompatible with the logic of carefully selecting a precise analog for a specific constitutional violation.[84] And it is not what the Court did in *Heck*.

---

[80] *Carey*, 435 U.S. at 258–59.

[81] *Id.* at 259.

[82] *Id.* at 258.

[83] *Manuel*, 580 U.S. at 370 (citation omitted).

[84] *See Carey,* 435 U.S. at 257–58 ("In some cases, the interests protected by a particular branch of the common law of torts *may* parallel closely the interest protected by a particular constitutional right." (emphasis added)); *Heck,* 512 U.S. at 483 (The rules developed by the common law of torts "provide the appropriate *starting point* for the inquiry under § 1983" (emphasis added) (citation omitted)); *Manuel*, 580 U.S. at 370 (referring to the need to "pinpoint[]" the "specific" constitutional right); *McDonough v. Smith*, 588 U.S. 109, 116 (2019) (quoting *Heck* and *Manuel* for the proposition that common-law tort principles are guiding rather than controlling).

No. 22-50998

In *Heck*, the Court used the common-law tort of malicious prosecution as its "starting point" for two reasons. First, malicious prosecution provided the "closest analogy"[85] to Heck's claims that the defendants had unlawfully and arbitrarily investigated and arrested him, knowingly destroyed exculpatory evidence, and caused illegal and unlawful evidence to be used at his trial.[86] And second, "it permits damages for confinement imposed pursuant to legal process."[87] Favorable termination came into play only because it is an element of the common-law tort of malicious prosecution.

The elements of a malicious prosecution claim are: (1) "the suit or proceeding was instituted without any probable cause"; (2) "the motive in instituting the suit was malicious, which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice"; and (3) "the prosecution terminated in the acquittal or discharge of the accused."[88] The Court adopted these elements "wholesale"[89] for Roy Heck's claim. The plurality today recognizes that these elements were adopted wholesale, but then makes an unfounded leap to conclude that the favorable-termination requirement must be met for "*any* § 1983 claim that seeks money damages for a tainted conviction."[90]

Malicious prosecution makes little sense as a common-law analog for Wilson's claims. Nothing about her allegations resemble the elements of

---

[85] *Heck*, 512 U.S. at 484.

[86] *Id.* at 479, 484.

[87] *Id.*

[88] *Thompson v. Clark*, 596 U.S. 36, 44 (2022) (internal quotation marks and citation omitted).

[89] *See Manuel*, 580 U.S. at 370 (citing *Heck* as an example of a court adopting the common-law rules for a specific analogous tort "wholesale").

[90] *Ante*, at 8 (emphasis added).

No. 22-50998

malicious prosecution. Wilson is not challenging the probable cause for her arrest, nor is she arguing that the motive in instituting her prosecution was malicious. She is instead bringing a procedural due process claim, asserting that a fundamental requirement of due process—a fair trial in a fair tribunal with a judge who is independent of the prosecution—was violated. Malicious prosecution with its favorable-termination requirement is no analog, much less a close one.

## D

To sum up, the question presented in *Heck* was whether *prisoners* could bring a claim that would necessarily challenge their convictions under § 1983. The Court was deeply concerned about the answer to that question because *if* the answer was yes, prisoners with outstanding criminal judgments could choose § 1983 over § 2254 and bring claims that, if successful, would require the prisoner's release, which is "as close to the core of habeas corpus as an attack on the prisoner's conviction."[91]

To answer the presented question, the Court had to determine the reach of § 1983. Because § 1983 is not a source of substantive rights, it looked to the common law as a "starting point" or "guide" and determined that malicious prosecution was the right fit for Heck's claims.

In what was clearly off-the-mark dicta, the Court mused that favorable termination might apply more broadly, but dicta does not bind us. And, as the next section will address, the Court *still* hasn't resolved whether non-prisoners must prove favorable termination—a point the Court has explicitly acknowledged. Regardless, malicious prosecution is a bad fit for Wilson's

---

[91] *Preiser*, 411 U.S. at 489.

No. 22-50998

claims, and we should not try to shoehorn the favorable-termination requirement where it does not fit.

Amidst the careful parsing of caselaw, it is important not to lose sight of what is at stake: the justification for stripping an explicitly conferred statutory cause of action to right constitutional wrongs. Comparing the justification for a custodial plaintiff to the one offered by the plurality is instructive. To the custodial litigant who is told that habeas is the only path, the message is reasonable: A canonical tool of statutory construction—that the general gives way to the specific—requires that your presumptive § 1983 cause of action give way to the habeas statute. By contrast, to the noncustodial litigant who is told that she is at the mercy of the state, the same state that nuked her constitutional rights, the message is unintelligible: Her statutorily conferred cause of action has been judicially negated to protect a set of values—comity, finality, and consistency—that § 1983 is necessarily and always in opposition to. That those values apparently only become relevant when you have the dual misfortune of the government violating your rights and then successfully hiding its dirty work only make the rationalization more dismaying.

## III

I'll now address the three post-*Heck* cases that the plurality believes "underscore [its] broad, tort-based conception of the favorable-termination element. Namely, that it applies to all § 1983 suits challenging a tainted conviction or sentence, regardless of whether the plaintiff is in custody."[92] With greatest respect, the plurality is wrong on all three.

---

[92] *Ante*, at 13.

No. 22-50998

A

The first is *Edwards v. Balisok*.[93]

Jerry Balisok was a prisoner who was punished for violating state prison rules—part of that punishment was the "deprivation of 30 days' good-time credit he had previously earned toward his release."[94] He appealed within the prison's appeal system, but his appeal was rejected because he failed to comply with the procedural requirements.[95] Balisok then filed a § 1983 damages action "alleging that the procedures used in his disciplinary proceeding violated his Fourteenth Amendment due process rights."[96] His allegations were "similar to those alleged by the plaintiff in *Heck*," as he claimed the hearing officer concealed exculpatory evidence and refused to ask certain questions of witnesses, all of which prevented Balisok from presenting exculpatory evidence.[97]

Balisok's "claim posited that the procedures were wrong, but not necessarily that the result was."[98] That said, Balisok's challenge, if successful, would necessarily *imply* that 30 days of his confinement would be invalid, which would in turn imply the invalidity of his outstanding criminal judgment and mean that he'd need to be released sooner.[99] Note that Balisok was a prisoner at the time he brought his § 1983 action, so just like in *Heck*, *Edwards* was a case where a *prisoner* with an "outstanding criminal

---

[93] 520 U.S. 641 (1997).

[94] *Edwards*, 520 U.S. at 643.

[95] *Id.*

[96] *Id.*

[97] *Id.* at 644.

[98] *Id.* at 645.

[99] *Id.* at 645–46.

No. 22-50998

judgment[]"[100] was trying to use § 1983 to get out of prison sooner. And the Court already made clear in *Preiser* that earlier release from prison is the domain of habeas.[101]

The plurality asserts that Balisok was arguing that "*Heck*'s analogy to the malicious prosecution tort . . . was a poor fit for Balisok's purely procedural claim."[102] But the Court in *Edwards* never actually addressed those arguments; instead, it just assumed, without analysis, that the favorable-termination requirement applied.[103] Indeed, the terms "malicious prosecution," "common-law," and "analog" are never mentioned in *Edwards*. The better interpretation of *Edwards* is that Balisok was a prisoner trying to get released sooner who attempted to sidestep *Preiser* and *Heck* by not seeking restoration of his good-time credits. But in the end, his claim looked just like Roy Heck's—if he succeeded, it would imply that his "outstanding criminal judgment[]"[104] was invalid and that he would need to be released earlier from prison.

Wilson's case is fundamentally different from *Edwards*—she is not in prison, so her success would not require her to be released from prison, earlier or at all.

_____

[100] *See Heck*, 512 U.S. at 486.

[101] *Preiser*, 411 U.S. at 489 (explaining that a damages action that "goes directly to the constitutionality of his physical confinement itself and seeks either immediate release from that confinement or the shortening of its duration" is "just as close to the core of habeas corpus as an attack on the prisoner's conviction").

[102] *Ante*, at 14.

[103] *Edwards*, 520 U.S. at 643–45.

[104] *See Heck*, 512 U.S. at 486.

No. 22-50998

B

Next, the plurality claims that the Court "recently reaffirmed [its] interpretation" of *Heck* in *McDonough v. Smith*.[105]

Edward McDonough was prosecuted twice based on what he alleged was fabricated evidence. His first trial ended in a mistrial and his second ended in his acquittal on all charges.[106] After his acquittal, McDonough brought a § 1983 damages action, asserting two claims: fabrication of evidence and malicious prosecution.[107] The question presented in the case was whether McDonough's fabrication of evidence claim accrued at the time of his acquittal "or at some point earlier."[108]

The Court approached the case just as it does for all § 1983 claims. It started by looking to the common law for an analogous tort to McDonough's fabrication-of-evidence claim. McDonough argued that the most analogous tort was malicious prosecution, and the Court agreed.[109] As we well know at this point, the common-law tort of malicious prosecution contains favorable termination as an element. Because "*Heck* explains why favorable termination is both relevant and required for a claim *analogous to malicious prosecution* that would impugn a conviction," it is no surprise that the Court

---

[105] *Ante*, at 15 (citing *McDonough v. Smith*, 588 U.S. 109 (2019)).

[106] *McDonough*, 588 U.S. at 113.

[107] *Id.* The statute of limitations for the malicious prosecution claim was not at issue before the Supreme Court. *Id.* at 114.

[108] *Id.* at 113.

[109] *Id.* at 116. The Court explained, "Common-law malicious prosecution requires showing, in part, that a defendant instigated a criminal proceeding with improper purpose and without probable cause. The essentials of McDonough's claim are similar: His claim requires him to show that the criminal proceedings against him—and the consequent deprivations of his liberty—were caused by Smith's malfeasance in fabricating evidence." *Id.* at 116–17 (citations omitted).

No. 22-50998

concluded "that rationale extends to an ongoing prosecution as well."[110] What's more, the Court was clearly focused on whether there could be accrual "at some point *earlier*" than acquittal, not after acquittal.[111] Consequently, *McDonough* merely "repeats *Heck*'s conclusion that an acquittal causes the claim to accrue, without discussing the question whether release from prison at the end of the sentence *also* does so."[112]

Even so, the plurality asserts *McDonough* resolved the question anyway because the Court stated that the "favorable-termination requirement . . . applies whenever 'a judgment in favor of the plaintiff would necessarily imply' that his prior conviction or sentence was invalid."[113] It takes the indefinite verb "whenever" to mean that favorable termination applies regardless of custodial status. I would not understand the Court to have resolved a question that it didn't tell us it was answering, especially where the common-law analog *did* have a favorable-termination requirement, and the Court was focused on whether a claim could accrue at a much earlier time than completion of a sentence. In fact, Justice Ginsburg, who had earlier said that *Heck* doesn't apply to noncustodial plaintiffs,[114] joined the majority opinion in *McDonough* and did not express that she had changed her view.[115] In sum, the plurality overreads *McDonough*. On whether *McDonough* settled

---

[110] *Id.* at 117–19, 123.

[111] *Id.* at 113–14 (emphasis added).

[112] *Savory*, 947 F.3d at 433 (EASTERBROOK, J., dissenting) (emphasis added).

[113] *McDonough*, U.S. at 119 (quoting *Heck*, 512 U.S. at 487).

[114] *Spencer*, 523 U.S. at 21 (GINSBURG, J., concurring) ("Individuals without recourse to the habeas statute because they are not 'in custody' (people merely fined or whose sentences have been fully served, for example) fit within § 1983's 'broad reach.'" (citation omitted)).

[115] *McDonough*, 588 U.S. at 112.

No. 22-50998

the reach of *Heck* and enshrined the dicta of footnote 10, I agree with Judge Easterbrook: "Certainly, *McDonough* . . . did not do so."[116] And accordingly, there are no "instructions impossible to ignore."[117]

## C

Finally, the plurality points to *Thompson v. Clark*.[118]

Larry Thompson was charged with state charges that were later dismissed before trial.[119] After his case was dismissed, Thompson brought a § 1983 damages claim for Fourth Amendment malicious prosecution. He alleged that "the police officers who initiated the criminal proceedings had 'maliciously prosecuted' him without probable cause."[120] Once again, the Court looked to the elements of the most analogous tort, which here was malicious prosecution. "[T]he gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause," which is "likewise the gravamen of the tort of malicious prosecution."[121] Accordingly, the Court held that "[i]n accord with the elements of the malicious prosecution tort, a Fourth Amendment claim under § 1983 for malicious prosecution requires the plaintiff to show a favorable termination of the underlying case against him."[122] The rest of the

---

[116] *Savory*, 947 F.3d at 433 (EASTERBROOK, J., dissenting).

[117] *Ante*, at 18.

[118] 596 U.S. 36 (2022).

[119] *Id.* at 39.

[120] *Id.*

[121] *Id.* at 43.

[122] *Id.* at 44.

No. 22-50998

Court's opinion focused on "flesh[ing] out what a favorable termination entails."[123]

The plurality infers that because Thompson was not in custody, "it should be clear beyond cavil that the favorable-termination element applies regardless of whether the § 1983 claimant was, is, or never could be in custody."[124] But the plurality misses a critical point: The reason the Court required favorable termination in Thompson's case is because the analogous common-law tort for Thompson's malicious-prosecution claim was, unsurprisingly, malicious prosecution, which contains favorable termination as an element. The Court never addressed Thompson's custodial status because it had no reason to. So *Thompson* could not have held that a favorable-termination requirement applied to noncustodial plaintiffs writ large.

D

In sum, not one of the post-*Heck* cases supports the plurality's position. The plurality fails to track what questions were presented by the cases and under what circumstances. The Supreme Court has never addressed the application of favorable termination to plaintiffs like Wilson who are not in custody and whose claims are not analogous to the common-law tort of malicious prosecution. In fact, the Court has acknowledged the ongoing debate and pointedly declined to resolve it, expressly stating in *Muhammad v. Close* that "this case is no occasion to settle the issue."[125]

As none of these cases addressed the issue, I would take the justices at their word and accept their pronouncement that the issue remains unsettled.

---

[123] *Id.* at 39, 44–49.

[124] *Ante*, at 18.

[125] 540 U.S. 749, 752 n.2 (2004).

No. 22-50998

IV

One last issue, the relevance of remedies beyond § 1983. The plurality lists "numerous avenues for pursuing favorable termination" available to Wilson during her eight-year term of community supervision.[126] The plurality's list is only accurate if one omits the pesky fact that Wilson could only have sought those remedies if she *knew* at the time that Petty had been moonlighting both as prosecutor and as de facto judge. Such an omission ignores the double horror of this case—that Wilson's due process rights were allegedly violated on a structural level *and* that the violation was successfully hidden from Wilson and the public for 20 years.

The plurality and the concurrence also stress that Wilson still has various non-§ 1983 avenues to challenge her tainted conviction.[127] These points elide the solitary issue before us: whether *Heck* even applies to noncustodial plaintiffs like Wilson. Whether Wilson might (or might not) be able to prove favorable termination outside of § 1983 only matters if *Heck* requires her to prove favorable termination *in the first place*. "When Congress supplies a constitutionally valid rule of decision, federal courts must follow it."[128] If Wilson is allowed to sue under § 1983, then it matters not whether she might also have state remedies available to her. That's the whole point of

---

[126] *Ante*, at 19.

[127] *Ante*, at 20–21.

[128] *Brown*, 596 U.S. at 127. If there is any concern that allowed access to federal habeas for non-custodial plaintiffs will open the floodgates with regard to litigation from prisoners, many prisoners would be barred by the doctrine of collateral estoppel, as the Court has concluded that the usual rules of preclusion apply in § 1983 actions. *Allen v. McCurry*, 449 U.S. 90, 103–105 (1980). Some of our sister circuits have also imposed a diligence requirement—meaning if a plaintiff could have realistically sought federal habeas relief when it was available, then the plaintiff cannot access § 1983, having bypassed habeas. *See Wilson*, 535 F.3d at 265–68; *Powers*, 501 F.3d at 601; *Cohen*, 621 F.3d at 1316–17.

No. 22-50998

§ 1983: to give those victimized by state officials a federal forum. The sole issue for us is whether *Heck* applies to noncustodial plaintiffs—nothing else.

The plurality and concurrence particularly focus on the availability of Texas state habeas. Texas's unique habeas statute specifies "[a]t the time the application is filed, the applicant must be, or *have been,* on community supervision."[129] Not all state habeas statutes reach this far. In this circuit, for example, Mississippi's statute only "extend[s] to all cases of illegal confinement or detention."[130] Under the concurrence's approach, the line between § 1983 being available or not "would depend on the vagaries of state law."[131] If Wilson happened to live in another state in *this* circuit, her case might well turn out differently based on the reasoning in the concurrence.

Also, and this cannot be overstated, to consider the existence of state remedies when determining the reach of § 1983 is, respectfully, contrary to the historical record. It was precisely "[b]ecause Congress lacked confidence in state institutions, including state courts, [that] it explicitly gave federal courts jurisdiction over the new civil action."[132] To then turn around, as the concurrence does, and say that there is no federal cause of action because Wilson could also pursue state remedies turns § 1983 on its head.[133] The concurrence asserts that if the plaintiff has the opportunity to obtain state relief, then she still has the chance to terminate her conviction. The concurrence's argument, in effect, requires the plaintiff to avail herself of

---

[129] Tex. Code Crim. Proc. 11.072 (emphasis added); *State v. Guerrero*, 400 S.W.3d 576, 582 (Tex. Crim. App. 2013).

[130] Miss. Code Ann. § 11-43-1.

[131] *Cf. Nance*, 597 U.S. at 161.

[132] Steinglass, *supra* note 33, § 2.2.

[133] *Ante*, at 33.

state court relief if the courthouse doors remain open.[134] But this misses the point. The state court's labors, or lack thereof, have no bearing on access to § 1983. One of the defining features of § 1983 is that plaintiffs *don't* have to go to state court first. The Court has had "no occasion to settle the issue" of whether *Heck* reaches noncustodial plaintiffs,[135] but it has declared it a "settled rule . . . that exhaustion of state remedies is not a prerequisite to an action under 42 U.S.C. § 1983."[136] Indeed, § 1983 provides "individuals immediate access to the federal courts notwithstanding any provision of state law to the contrary."[137] Inexplicably, the plurality and concurrence point Wilson back to state court anyway.

It is especially bizarre to mandate state-law exhaustion within the very criminal system and the "very state officials" who failed Wilson for decades and "whose hostility to those rights precipitated [her] injuries."[138] Were she to return to state court, she would not even necessarily be provided counsel as a matter of course.[139] Would any indigent defendant in Wilson's

---

[134] Oddly enough, the concurrence's concern for state court proceedings would effectively reward plaintiffs who do *not* exhaust state court remedies when they have the chance and would not be workable. For example, a plaintiff—who does not wish to undergo the effort required to pursue state court remedies—may choose to let the limitations period lapse to *purposefully* close state court doors before skipping ahead to pursue § 1983 relief.

[135] *Muhammad v. Close*, 540 U.S. 749, 752 n.2 (2004).

[136] *Knick v. Twp. Of Scott, Pa.*, 588 U.S. 180, 185 (2019) (internal quotation marks and citation omitted).

[137] *Felder v. Casey*, 487 U.S. 131, 147 (1988) (quoting *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 504 (1982)).

[138] *Id.*

[139] Tex. Code Crim. Proc. Art. 1.051(d)(3) ("An eligible indigent defendant is entitled to have the trial court appoint an attorney to represent him in . . . a habeas corpus proceeding *if* the court concludes that the interests of justice require representation." (emphasis added)).

No. 22-50998

circumstance—someone stripped of core constitutional rights by a rigged judicial system—have realistic hope for vindication? Forcing Wilson to seek relief from the same system that victimized her reduces § 1983 to a mere paper promise.

V

Our circuit has been on the wrong side of this fateful split for almost a quarter-century. Today, we squander the opportunity to take "[t]he better view" of *Heck* by holding that "a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement."[140]

When Wilson learned that she had been victimized by Petty's mind-boggling conflict of interest, had she read § 1983's sweeping textual command, she would have been heartened to take Congress at its word that she had a federal-court remedy for what she had endured. It may be true that a federal-court remedy isn't guaranteed for *every* constitutional violation.[141] But the historical record shows that § 1983 was enacted to provide one for a wide swath of violations that couldn't be entrusted to protection by the state courts.[142] Today, the court "unjustifiably limit[s]" that "plain breadth of § 1983," leaving plaintiffs like Wilson violated but not vindicated.[143] There is no justification for applying *Heck*'s favorable-termination requirement so

---

[140] *Spencer*, 523 U.S. at 21 (SOUTER, J., concurring).

[141] *See ante*, at 30 n.6.

[142] *See ante*, at 39–41, 62. In light of this historical record, the availability of state habeas or other state relief does not move the needle on a noncustodial plaintiff's access to federal relief under § 1983.

[143] *Spencer*, 523 U.S. at 21 (SOUTER, J., concurring).

No. 22-50998

broadly. We are not bound by dicta in *Heck*'s footnote 10, it makes little sense to apply a favorable-termination rule to noncustodial plaintiffs whose claims are not analogous to the common-law tort of malicious prosecution, no post-*Heck* precedent binds us, and the en banc court's justifications collide head-on with § 1983.

When Justice Ginsburg disavowed *Heck*'s footnoted musings on the ancillary question of noncustodial plaintiffs, she cited Justice Frankfurter's maxim that "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late."[144] Unfortunately for our circuit—and unfortunately for Wilson—wisdom remains a no-show. The only hope for wronged noncustodial plaintiffs like Erma Wilson is that the Supreme Court will at last confront the persistent circuit split, seize this "occasion to settle the issue,"[145] and vindicate a bedrock constitutional guarantee that, sadly, is even more tenuous in today's plea-bargain age than when the Founding generation first enshrined it.

Respectfully yet emphatically, I dissent.

---

[144] *Id.* (GINSBURG, J., concurring) (quoting *Henslee v. Union Planters Nat'l Bank & Tr.*, 335 U.S. 595, 600 (1949) (FRANKFURTER, J., dissenting)).

[145] *Muhammad*, 540 U.S. at 752 n.2.